[No. 2295]

# G. F. TALBOT, APPELLANT, *v.* C. E. MACK, RESPONDENT.

[169 Pac. 25]

1. APPEAL AND ERROR—SCOPE—"JUDGMENT ROLL."

Where demurrer to complaint for libel was sustained, all the matters pertaining to the proceedings in the trial court so far as affecting the plaintiff's rights are embraced in the "judgment roll" within Rev. Laws, 5273, subd. 2, stating what constitutes the judgment roll, so that under Stats. 1915, c. 142, sec. 11, permitting an appeal on the judgment roll alone, it was unnecessary to file assignments of error as required by section 13 of such act.

2. JUDGMENT—ENTRIES NUNC PRO TUNC.

The object and purpose of a *nunc pro tunc* order is to make the record speak the truth concerning acts already done, and not to supply an omitted action.

3. LIBEL AND SLANDER—WORDS LIBELOUS PER SE—HOW DETERMINED.

In determining whether words charged are libelous *per se*, they are to be taken in their plain and natural import according to the ideas they convey to those to whom they are addressed, reference being had not only to the words themselves but also to the circumstances under which they were used.

4. LIBEL AND SLANDER—PARTICULAR WORDS—"OVERLOAD."

The term "overload," used in a letter stating that an insurance business was overloaded, means bearing too heavy a burden or too heavily loaded, but implies nothing defamatory on its face in the sense of imputing dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability.

5. LIBEL AND SLANDER—PARTICULAR WORDS—OVERLOAD.

Statement in letter to stockholders in insurance company, that the company is overloaded with salaries and traveling expenses, without making reference to the plaintiff, is not libelous *per se*.

6. LIBEL AND SLANDER—WORDS "LIBELOUS PER SE."

Any false and malicious writing published of another is "libelous *per se*" when its tendency is to render the party contemptible or ridiculous in public estimation or expose him to public hatred or contempt.

7. LIBEL AND SLANDER—INNUENDO—FUNCTION.

Language or terms, which are not libelous *per se*, when viewed in the light of their general acceptation and understanding in the community or vicinity in which they are used, cannot be made so through the function or force of an innuendo.

8. LIBEL AND SLANDER—INNUENDO—FUNCTION.

The innuendo will not introduce new matter, nor will it be permitted to aid to the extent of enlarging the meaning of the words or expressions used.

9. LIBEL AND SLANDER—"LIBELOUS PER SE"—"LIBELOUS PER QUOD."
 Words or expressions are "actionable *per se*" when their injurious character is a fact of common notoriety and generally so understood where the utterance is published, and words or expressions "libelous *per quod*" are such as require that their injurious character or effect be established by allegation and proof.

10. LIBEL AND SLANDER—INNUENDO—FUNCTION.
 In action for libel, if the words or expressions complained of are ambiguous or equivocal, the innuendo may assign the true meaning the plaintiff believes them to bear; but if the words alone, or the words limited by circumstances duly pleaded, are not defamatory, the innuendo cannot make them so.

11. LIBEL AND SLANDER—WORDS "LIBELOUS PER SE."
 While words which directly tend to the prejudice of any one in his office, profession, trade, or business are actionable *per se*, all words disparaging persons in such matters are not, without proof of damage, actionable in themselves.

12. LIBEL AND SLANDER—ACTIONABLE WORDS—CHARACTER.
 In action for libel there can be no recovery unless the actionable words or assertions referred to the plaintiff at least with reasonable certainty.

13. LIBEL AND SLANDER—PLEADING—SPECIAL DAMAGES.
 In action for libel by words not actionable *per se*, special damages must be alleged and proved.

14. LIBEL AND SLANDER—PLEADING—SPECIAL DAMAGES.
 In action for damages by words not actionable *per se*, the allegation that "by means of said false, libelous and defamatory publication or publications the plaintiff herein was injured in his reputation and good name and standing to his damage in the sum of $50,000," is insufficient as an allegation of special damages.

APPEAL from Second Judicial District Court, Washoe County; *Mark R. Averill,* Judge.

Action by G. F. Talbot against C. E. Mack. Judgment for defendant, and plaintiff appeals. **Affirmed.**

*G. F. Talbot, Sardis Summerfield, Miller & Mashburn,* and *Robert Richards,* for Appellant:

The letter alleged to be libelous could not be absolutely privileged, as claimed in the demurrer, because absolute privilege pertains only to matters legislative or judicial or relating to the army or navy. (Newell, Libel and Slander, 3d ed. sec 508; Odgers, Libel and Slander, 5th ed. p. 230.) The complaint alleges that the statement was false and made by the defendant for the purpose of

injuring the reputation of the plaintiff, thereby showing that the defendant exceeded his privilege and made himself liable. (Newell, Libel and Slander, 2d ed. 475, 524, 527, 529; *White* v. *Nicholls*, 3 How. 266, 11 L. Ed. 591; *Hoover* v. *Jordan*, 150 Pac. 333.)

Malice is presumed if the statement is false and made for the purpose of injuring, and it is not indispensable to use the word "malicious" in the declaration, it being sufficient if words of equivalent power or import are used. (*White* v. *Nicholls, supra;* 3 Sutherland, Code Pleading, sec. 3948.)

The false words are actionable without an allegation of special damages. Both at common law and in this country, without alleging special damages or words which impute crime, the action will lie for the words published which are injurious to one in his trade or profession. A woman may recover for slander of her good name without alleging special damages; and such slander is actionable *per se,* although the moral delinquency imputed by the slanderous words is not made an offense by statute. (*Newman* v. *Stein,* 75 Mich. 402, 42 N. W. 956, 13 Am. St. Rep. 447; *Prescott* v. *Tousey,* 50 N. Y. Super. Ct. 12; *Indianapolis Journal N. Co.* v. *Pugh,* 6 Ind. App. 510, 33 N. E. 991; *Ward* v. *Ward,* 36 Ohio St. 107, 38 Am. St. Rep. 107.)

A publication tending to cover a woman named therein with ridicule, contempt, and disgrace, and cause her to be shunned and avoided by the society in which she lives as being lewd and immoral, is a libel for which action will lie. (*Weir* v. *Weir,* 6 Ala. 881; *McKinney* v. *Roberts,* 68 Cal. 192, 8 Pac. 857; *Williams* v. *McManus,* 38 La. Ann. 161; *Rosmie* v. *Ryder,* 8 N. Y. Supp. 5; *McGee* v. *Wilson,* 16 Ky. 187; *Miller* v. *Parish,* 25 Mass. 384; *Nelson* v. *Wallace,* 48 Mo. App. 193; *Gibson* v. *Gibson,* 43 Wis. 23.)

A publication concerning a clergyman of the words "then there was that Beecher business of his which beat him out of a station at Grass Lake," if it does not charge adultery, implies a loss of position or a charge of immoral conduct affecting his character. (*Bailey* v. *Kalamazoo*

*Pub. Co.*, 40 Mich. 251; *Page* v. *Merwin*, 54 Conn. 426; *Morris* v. *Barkley*, 11 Ky. 64; *People* v. *District P. & T. Co.*, 54 Mich. 457, 20 N. W. 528.)

Words written of a man in relation to his business or occupation which have a tendency to hurt or are calculated to prejudice him therein are actionable, although they charge no fraud or dishonesty and were without actual malice, and when proved, unless defendant show a lawful excuse, plaintiff is entitled to recover. (*Moore* v. *Francis*, 121 N. Y. 199; *Krugg* v. *Pitass*, 162 N. Y. 154, 159; *Bornmann* v. *Star Co.*, 174 N. Y. 212, 219; *Cruikshank* v. *Gordon*, 118 N. Y. 178, 183; *Holmes* v. *Jones*, 121 N. Y. 461, 24 N. E. 701; *Sawyer* v. *Bennett*, 20 N. Y. Supp. 835.) A communication imputing disgraceful complicity in the conduct of an insurance swindle, and charging one with culpable, if not criminal, misbehaving in the management of its business, is libelous *per se.* (*Hartman* v. *Morning Journal*, 19 N. Y. Supp. 398.) When reputation, trade, or profession of a man is really affected, every appeal to the tribunals of our country ought to be liberally sustained. (*Rue* v. *Mitchell*, 2 Dall. 58, 1 L. Ed. 238; *Francis* v. *Flynn*, 118 U. S. 385.)

Malice is essential to the support of an action for slanderous words, but malice is presumed until the contrary is proved, except in those cases where the occasion *prima facie* excuses the publication. (Newell, Libel and Slander, 38.) Communications which upon proper occasion are qualifiedly privileged are not privileged when made by persons actuated by malice. (*Smith* v. *Smith*, 73 Mich. 445, 3 L. R. A. 52, 15 Am. St. Rep. 594; *King* v. *Patterson*, 49 N. J. L. 417, 9 Atl. 705.)

Words are actionable without allegation of special damage. (*Smith* v. *Smith*, 73 Mich. 445, 41 N. W. 499; *Peterson* v. *Western U. T. Co.*, 65 Minn. 18, 67 N. W. 646, 33 L. R. A. 302; *Cooper* v. *Greeley*, 1 Denio, 347; *Watson* v. *Trask*, 6 Ohio, 531; *State* v. *Mason*, 26 Or. 273, 38 Pac. 130; *McCorkle* v. *Binns*, 5 Bin. 340, 6 Am. Dec. 420; *Adams* v. *Lawson*, 7 Grat. 250, 94 Am. Dec. 455; *Bradley* v. *Cramer*, 59 Wis. 309; *Solverman* v. *Peterson*, 64 Wis. 198; *Allen* v.

*News Pub. Co.*, 81 Wis. 120, 50 N. W. 1093; *Riley* v. *Lee*, 88 Ky. 603; *Rice* v. *Simmons*, 2 Har. 417.)

Imputations injurious to profession or business are actionable. (*Kelly* v. *Huffington*, 3 Cranch, C. C. 81; *Broughton* v. *McCraw*, 39 Fed. 672; *Ohio & M. Ry. Co.* v. *Press Pub. Co.*, 48 Fed. 206; *Jones* v. *Greeley*, 25 Fla. 629, 6 South. 448; *Morasse* v. *Brochu*, 15 Mass. 567; *Henkel* v. *Schaub*, 94 Mich. 542; *Williams* v. *Davenport*, 42 Minn. 363; *St. James M. A.* v. *Gaiser*, 135 Mo. 517; *Burtch* v. *Nickerson*, 17 Johns. 217; *Carpenter* v. *Dennis*, 5 N. Y. Super. Ct. 305; *Price* v. *Conway*, 134 Pa. 340; *Lapham* v. *Noble*, 54 Fed. 108.)

Libel on trade or profession is distinguishable from cases requiring allegation of special damage. (*Shafer* v. *Ahalt*, 48 Md. 171; *Hallock* v. *Miller*, 2 Barb. 630; *Hoar* v. *Ward*, 47 Vt. 657; *Platto* v. *Gielfuss*, 47 Wis. 491; *Benz* v. *Wiedenhoeft*, 83 Wis. 397.) An action will lie for damages resulting from words spoken with intent to injure plaintiff in his profession, although the words were not defamatory, though the injury was the natural and proper result of the speaking of the words. (*Morasse* v. *Brochu, supra; Nicholson* v. *Rust*, 52 S. W. 933; *Johnson* v. *Fone*, 80 Minn. 315; *Kenneberg* v. *Neff*, 74 Conn. 62.)

While innuendo may not alter the sense of the words complained of, it may point out the real meaning of the language and give the sense of the words used as intended by the person who used them, and as understood by those to whom they were published, especially when an accusation has not been made bluntly and the person against whom directed has not been named. This is the very office and function of the innuendo in pleading. (17 R. C. L. 395, 396.)

*Mack & Green, Geo. S. Green,* and *A. F. Lasher,* for Respondent:

The words complained of are not libelous in any sense. "In every action for defamation two things are necessary: (1) defamation apparent from the words themselves, for no innuendo can alter the sense; (2)

certainty as to the person who is defamed, for no innuendo can render certain that which is uncertain." (Newell, Defamation, Slander and Libel, p. 248; *Chiatovich* v. *Hanchett*, 88 Fed. 873.)

Where words are not libelous *per se*, the complaint must set up special damage or no cause of action is stated. (Am. & Eng. Ency. Law, 2d ed. vol. 18, p. 1085; *Nichols* v. *Daily Reporter Co.*, 30 Utah, 74; *Furlong* v. *German-American Press Assn.*, 189 S. W. 385; *Fry* v. *McCord*, 95 Tenn. 678; *Dun* v. *Maier*, 83 Fed. 169; *Manire* v. *Hubbard*, 22 Ky. 1753; *Langdon* v. *Shearer*, 60 N. Y. Supp. 193; *Barnes* v. *Trundy*, 31 Me. 321; *Rammell* v. *Otis*, 60 Mo. 365; *Newbold* v. *Bradstreet*, 57 Md. 38; *Studdard* v. *Trucks*, 31 Ark. 726.)

"An innuendo cannot introduce new matter, or enlarge the natural meaning of words, or put upon them a construction they will not bear." (*Price* v. *Conway*, 19 Atl. 687; *Smith* v. *Ayee*, 178 Ala. 627; *Grand* v. *Dreyfus*, 122 Cal. 58; *Mellen* v. *Times-Mirror Co.*, 167 Cal. 587.) When the words complained of are libelous *per se*, no innuendo is necessary. (*Gustin* v. *Evening Press Co.*, 172 Mich. 311; 25 Cyc. 451.) In determining whether language is libelous *per se*, "it must be construed in its relation to the entire article in which it appears." (*Cooper* v. *Romney*, 49 Mont. 119.) When the words are not ambiguous the question of libel or no libel is one of law for the court. (*Mellen* v. *Times-Mirror Co.*, *supra*.)

In order to be actionable *per se* by reason of their tendency to injure the plaintiff in his office or employment, the words complained of must touch him injuriously in his office or employment. (25 Cyc. 327, 328; *Stannard* v. *Wilson & Gibbs*, 118 Md. 151, 84 Atl. 335.)

The complaint contains no allegation of special damage. "Special damages are those that are the natural, but not the necessary, result of the act complained of, and consequently are not implied by the law, and must be particularly stated and proven." (Words and Phrases, vol. 7, p. 6572; Am. & Eng. Ency. Law, 2d ed.

vol. 18, p. 1088; *Pollard* v. *Lyon,* 91 U. S. 225; *Rade* v. *Press Pub. Co.,* 75 N. Y. Supp. 298; *Fry* v. *McCord,* 95 Tenn. 678.)

Where the communication complained of is not libelous *per se,* malice can only be inferred from unnecessary or impertinent language which attacks the honesty, integrity, virtue, or reputation of plaintiff, and this is especially true where the alleged libelous communication appears from its face to be privileged. (*Holmes* v. *Clisby,* 121 Ga. 241; *Cooley* v. *Galyon,* 109 Tenn. 1; *Holmes* v. *Royal Fraternal Union,* 26 L. R. A. n. s. 1081; *Chambers* v. *Leiser,* 43 Wash. 285.)

Assignment of errors not having been filed within the time limited by the statute, the appeal should be dismissed. (Stats. 1915, sec. 13, p. 166; *Coffin* v. *Coffin,* 40 Nev. 345.)

The purpose of a *nunc pro tunc* entry is to correct the record of something already done; it cannot supply omitted action. (Words and Phases, vol. 5, p. 4869; *Kirby* v. *Bowland,* 69 Ind. 290; *Bramlett* v. *Pickett,* 12 Am. Dec. 350; *Hickman* v. *City,* 141 U. S. 415; *Wright* v. *Nicholson,* 134 U. S. 136; *Hyde* v. *Curling,* 10 Mo. 359.) The time limit fixed by statute for filing assignments of error or bills of exception cannot be evaded by *nunc pro tunc* entries. (*Wyllie* v. *Heffernan,* 58 Mo. App. 675; *Nixon* v. *Phelps,* 29 Vt. 198; *State* v. *White,* 16 Ind. App. 260; *Dorman* v. *Coon,* 24 S. W. 731.)

By the Court, McCarran, C. J.:

This was an action in tort instituted by appellant, as plaintiff, against respondent for damages claimed to have been sustained by appellant by reason of libel. The demurrer to appellant's complaint being sustained, and appellant having declined to amend, judgment was entered against him in favor of respondent. From the judgment thus entered and from the order of the trial court in sustaining the demurrer, appeal is taken to this court.

We are first concerned with the matter of a motion to

dismiss the appeal upon the ground that no assignment of errors was served or filed in this court within the time prescribed by law. In this respect respondent relies on section 13 of an act entitled "An act supplemental to and to amend an act entitled 'An act to regulate proceedings in civil cases in this state and to repeal all acts in relation thereto,' approved March 17, 1911," approved March 16, 1915, and found in Statutes of 1915 at page 164. The section reads as follows:

"Within twenty days after any appeal has been taken from any order or judgment, the party or parties appealing shall serve the adverse parties and file with the clerk of the supreme court an assignment of errors, which assignment shall designate generally each separate error, specifying the page and lines of the record wherein the same may be found. Any error not assigned shall not be considered by the supreme court. If the party fails to file such assignment within the time limited no error shall be considered by the supreme court. The assignment of errors herein provided for shall be typewritten, paged, and the lines numbered, and the appellant shall furnish three copies thereof for filing in the supreme court."

The record as it is before us discloses a total failure on the part of appellant to serve or file any assignment of errors, and appellant seeks by separate motion in this court to have an order made permitting him to file his assignment of errors *nunc pro tunc*. With the last-mentioned motion it will, in our judgment, be unnecessary for us to deal, in view of the position that we shall here take and which we deem proper under the statute.

Section 11 of the act of 1915, referred to, is as follows:

"The original bills of exceptions herein provided for, together with a notice of appeal and the undertaking on appeal, shall be annexed to a copy of the judgment roll, certified by the clerk or by the parties, if the appeal be from the judgment; if the appeal be from an order, such original bill shall be annexed to such order, and the same shall be and become the record on appeal when

filed in the supreme court. A party may appeal upon the judgment roll alone, in which case only such errors can be considered as appear upon the face of the judgment roll."

As to what constitutes the judgment roll, our civil practice act, section 5273, Revised Laws (section 331, Civil Practice Act), provides:

"Immediately after entering the judgment, the clerk must attach together and file the following papers, which constitute the judgment roll: (1) In case the complaint is not answered by any defendant, the summons, with the affidavit or proof of service; the complaint with memorandum indorsed thereon that the default of the defendant in not answering was entered, and a copy of the judgment. * * * (2) In all other cases, the pleadings, a copy of the verdict of the jury, or finding of the court or referee, all bills of exceptions taken and filed, and a copy of any order made on demurrer or relating to the change of parties, and a copy of the judgment. * * * "

1. It was not necessary, in view of the specific provisions of the several sections of our statute pertaining to practice on appeals, for the appellant in this case to file or serve an assignment of errors as contemplated by section 13 of the practice act of 1915. The appeal here taken is from the order of the district court sustaining the demurrer to appellant's complaint and from the judgment entered pursuant to appellant's failure to amend; hence under subdivision 2 of section 5273, Revised Laws, all of the matters pertaining to the proceedings in the trial court, so far as those proceedings affect the standing or rights of appellant, are properly here embraced within the judgment roll as certified by the clerk of the district court. Respondents, in furtherance of their motion to dismiss plaintiff's appeal, refer to the decision of this court in the case of *Coffin* v. *Coffin*, 40 Nev. 345, wherein we dismissed the appeal upon a motion made for that purpose for the reason that appellant had failed to comply with section 13 of the

practice act of 1915, inasmuch as he had failed to serve or file his assignment of errors within time. That case is not controlling in the matter at bar. It is distinguished from the case under consideration inasmuch as there the appeal was sought to be taken from the judgment entered after trial on the merits and from the order overruling appellant's motion for a new trial. Here the appeal is from an order sustaining a demurrer. In the Coffin case the errors, if any, were not contended for as pertaining to matters properly appearing in the judgment roll. In the matter at bar the very error contended for, and indeed the only error contended for, is the order of the trial court sustaining the demurrer and pursuant to section 5273, Revised Laws, is properly embraced within and is on the face of the judgment roll. Not only that, but the section of the code last referred to provides that "all bills of exceptions taken and filed" shall be a part of the judgment roll; and in the judgment roll as it is before us we find the bill of exceptions taken to the order sustaining the demurrer and the same duly allowed by the trial judge and filed on the date of the entry of judgment.

If the matters or proceedings which appellant sought to have reviewed by this court on appeal were not properly embraced within the judgment roll, then the motion to dismiss should prevail under the doctrine of the Coffin case, supra. The case at bar falls directly within the provision of section 11 of the practice act of 1915, providing for the consideration of errors which appear upon the face of the judgment roll when appeal is from the judgment alone. Under this provision of the statute it is manifest that the intendment of the lawmakers was to require no assignment of errors in a case such as this, where the order appealed from and the error complained of were all embraced within matters properly belonging to the judgment roll and were brought to this court in that form. Indeed, if it were otherwise, it would at most only require a repetition, by way of assignment of error,

of that which was already excepted to and assigned as error in the bill of exceptions contained in the judgment roll. This court has held *Peers* v. *Reed,* 23 Nev. 404, 48 Pac. 897) that on an appeal taken from the judgment alone, where there is no statement or bill of exceptions in the record, there will be a consideration only of the record constituting the judgment roll. It is in the record constituting the judgment roll that the very error relied upon by appellant is brought to this court. Hence we conclude that no assignment of errors as contemplated by section 13 of the civil practice act of 1915 is necessary or required in such a case.

2. Viewing the matter as we do, it becomes unnecessary for us to determine the question as to the right of appellant to an order *nunc pro tunc.* Suffice it to say in this respect, however, that we find it to be a rule supported by eminent authority that the object and purpose of a *nunc pro tunc* order is to make a record speak the truth concerning acts already done. Without determining the question here, we deem it sufficient to intimate that an order *nunc pro tunc* cannot be made use of or resorted to to supply omitted action. (*Wight* v. *Nicholson,* 134 U. S. 136, 10 Sup. Ct. 487, 33 L. Ed. 865; *Hyde* v. *Curling,* 10 Mo. 359; *Hickman* v. *City of Fort Scott,* 141 U. S. 415, 12 Sup. Ct. 9, 35 L. Ed. 775; *Wyllie* v. *Heffernan,* 58 Mo. App. 657; *State* v. *White,* 16 Ind. App. 260, 44 N. E. 589.)

This brings us to a consideration of the principal question here involved, namely, the action of the trial court in sustaining the demurrer to appellant's complaint.

The complaint, by way of colloquium or inducement, averred the standing of appellant in the community, relating the fact of his having conducted and demeaned himself with honesty, integrity, and fidelity, enjoying the confidence and esteem of the people of the State of Nevada to a remarkably high degree; of his having held positions of honor and trust within the state; a district judge of one of the judicial districts for a period

of twelve years, a justice of the supreme court of the state for an equal period, during all of which time he had "never been accused or suspected of having been guilty of any dishonesty or of any lack of integrity or fair dealing, which would injure his reputation or good standing." The complaint relates:

"That during all of the time between the 20th day of March, 1911, and the 7th day of March, 1916, said plaintiff (appellant here) was a director and the president and one of the members of the executive committee of Nevada Fire Insurance Company, a corporation, organized and existing under and by virtue of the laws of the State of Nevada, doing a general fire insurance business since the 1st day of March, 1914, and having its office at Carson City, Nevada, a part of that time, but now at the city of Reno, State of Nevada; that, as such director, president, and member of said executive committee of said corporation, said plaintiff was during all that time the general, financial, and business manager of said corporation and of the investments, business, and affairs thereof, except that the business of said corporation relating to risks or fire insurance was under the direction of Robert Carlson, an insurance expert; and that plaintiff, with the other directors of said corporation at the times of the meetings of the board of directors thereof, had charge and control of and handled the business and financial affairs and more especially the expenditures of said corporation, and, during the intervals between such meetings of such board of directors, he with the other members of said executive committee at the times of the meetings of said committee, had charge and control of and handled such affairs and expenditures thereof, and, during the intervals between the meetings of said committee and board, he alone had charge and control of and handled such affairs and expenditures of said corporation, except that the business of said corporation relating to risks or fire insurance was so under the direction of said insurance expert, and investments of the funds of the said company were made on orders

drawn by the plaintiff and signed by him and other members of the executive committee; that there was no meeting of the said board of directors or executive committee by said corporation from the time said corporation began writing insurance on the 1st day of March, 1914, until the meeting thereof held on the 7th day of March, 1916, except annually; and that, during the intervals between said meetings of said board of directors and those of said executive committee, during that time, said plaintiff had full and complete charge and control of all matters of expenditure of said corporation for the salaries of the employees and officers thereof and for their traveling expenses, except such as were provided for and controlled by the contracts of said corporation with said Robert Carlson and plaintiff providing for their salaries and services.

"III. That on or about the 2d day of March, 1915, at the office of said corporation in Carson City, Nevada, said Nevada Fire Insurance Company, a corporation, made and entered into a contract with the plaintiff herein by which said corporation employed the said plaintiff for a portion of his time only for the period of one year thereafter, to serve said corporation as its president and general counsel and, as such, to exercise general care over its affairs and, in addition to performing the ordinary duties of its president and such other duties as might be directed or advised by its board of directors and executive committee, to draw mortgages, examine abstracts, and assist in making loans, to endeavor to make sales of the treasury stock of said corporation, to secure the writing of insurance, and to increase the business and advance the best interests of the corporation generally, for all of which said plaintiff was to be paid a salary and remuneration by said corporation of $300 per month and 5 per cent of the profits made by said corporation from its underwriting business, or investments, or otherwise during that year, he to devote at least one-half of his time to the duties of such employment and be allowed to practice law during said

period of one year on his own account, which contract plaintiff faithfully performed.

"IV. That said contract of employment was so made by said corporation pursuant to a resolution duly and regularly offered, moved, and passed by the board of directors of said corporation in and at the regular annual meeting thereof held on or about the 2d day of March, 1915, and that at the time said resolution was so passed the plaintiff herein was one of the directors of said corporation so assembled in annual meeting and was present at the time but did not vote on said resolution; and that he then had been such director and the president of the said corporation and a member of the executive committee thereof and in charge of its affairs generally ever since it was so organized.

"V. That said plaintiff was so employed by said corportion and so elected its said president by the stockholders thereof because of his good reputation and of his business ability and position as hereinbefore stated in paragraph numbered I hereof.

"VI. That said defendant, C. E. Mack, of Reno, Nevada, on the 18th day of January, 1916, at Reno, Nevada, contriving to injure the plaintiff herein, and his general reputation for honesty, integrity, fidelity, business ability, and fair dealing, and thereby expose him to public hatred and contempt, did then and there publish in a letter written and deposited by him in the United States postoffice or mail at Reno, Nevada, postage prepaid, and addressed to one Ed. Carville at Elko, Nevada, one of the stockholders of said corporation, the following words, figures, and characters of and concerning the plaintiff herein:

" 'C. E. Mack                          Geo. S. Green
        " 'Mack & Green, Attorneys at Law.
      " 'Rooms 221–222 Odd Fellows' Temple.
          " 'P. O. Box 317.   Phone 490.
                    " 'Reno, Nevada, Jan. 18, 1916.
    " 'Ed Carville, Elko, Nevada—Dear Sir:   I went to Carson on the 31st day of December last and examined

the books and affairs of the Nevada Fire Insurance Company. I find the company has been doing a good business and undoubtedly will make a small net profit during the fiscal year. I find, however, that the company is overloaded with salary and traveling expense to the extent of nearly ten thousand dollars per year. This expense account should be reduced to $5,000 per year.

" 'As near as I can learn the board of trustees have not met since last March.

" 'I urge you to attend the next stockholders' meeting to be held on March 7th next, and if you cannot attend said meeting, then if you will sign and send me the inclosed proxy, I will attend the next meeting of the stockholders and vote every share sent to me, together with my own, in favor of reducing the salary and traveling expense account from ten thousand dollars to five thousand dollars per annum. When this is done I am satisfied that within twelve or eighteen months the Nevada Fire Insurance Company can pay a dividend to its stockholders.

" 'As I am not personally acquainted with many of the stockholders, for that reason I refer you to the Farmers' & Merchants' National Bank of Reno, the Lyon County Bank of Yerington, and the Bank of Sparks, at Sparks, as to my standing in the community in which I reside.　　　Sincerely yours,　　　C. E. Mack,

" 'Stockholder of the Nevada Fire Insurance Company'

—and that said plaintiff is informed and upon such information verily believes, and therefore alleges upon such information and belief, that on or about the 18th day of January, 1916, at Reno, Nevada, said defendant, contriving to injure the plaintiff herein, and his general reputation for honesty, integrity, fidelity, business ability, and fair dealing, and thereby to expose him to public hatred and contempt, did then and there publish in about 260 other letters identical with that hereinbefore quoted, except as to the names and addresses of the persons to whom they were sent, the exact number of which said plaintiff does not know and cannot

ascertain and allege at the time of the filing hereof, written and deposited by him in the United States post-office or mail at Reno, Nevada, postage prepaid, and addressed and directed to about 260 of the other stock-holders of said corporation, among whom were the following."

Then follows a long list of the names of persons residing in this and adjoining states, alleged to be stock-holders of the Nevada Fire Insurance Company and to whom the letter is alleged to have been written.

Section 7 of appellant's complaint is as follows:

"That the following words contained in said letters and the said publication or publications thereof were false, libelous, and defamatory, 'I find, however, that the company is overloaded with salary and traveling expense to the extent of nearly $10,000 per year,' and were so published of and concerning said plaintiff, and that the remaining statements in said letters were wil-fully and maliciously intended by said defendant to give force, color, and effect to the false and defamatory publication hereinbefore in this paragraph quoted."

The complaint then alleges that the stockholders who received the letter containing the libelous matter com-plained of understood the same, and that the defendant intended that they should so understand the publication, for the purpose of injuring the plaintiff and his repu-tation for honesty, integrity, fidelity, business ability, and fair dealing, and thereby expose him to public hatred and contempt. The demurrer interposed to this complaint was lengthy and specific. It challenged the complaint, among other things, on the grounds of failure to state facts sufficient to constitute a cause of action.

The trial court held the complaint good as against the demurrer in all respects save and except as to the neces-sity of alleging special damages. In other words, the only point on which the lower court sustained the demurrer was that the words used in the letter upon which the action was based were not actionable *per se,* and for this reason alone special damages must be

alleged and proven. Therefore the only questions with which we are here concerned may be stated as follows:

(1) Are the words complained of actionable *per se?*

(2) Is it necessary, in view of the language of the letter and in view of the allegations of the complaint, for plaintiff to allege and prove special damages?

In approaching the principal question here, it may be well to note at the outset that the letter written by respondent, in which the libelous words and assertions are alleged to exist, nowhere mentions the appellant. The assertion in the letter to which libel is attributed is all contained in one sentence:

"I find, however, that the company is overloaded with salary and traveling expenses to the extent of nearly $10,000 per year."

The whole question might be said to turn on the word or term "overloaded."

Section 8 of the complaint performs the office and function known in pleadings of this kind as the "innuendo." There it is alleged:

"That said defendant intended and meant by said above-quoted words so constituting said false and libelous and defamatory publication or publications that the plaintiff herein took advantage of his offices as a director and the president of said corporation and of his position as a member of the executive committee thereof and of the confidence and trust reposed in him by the other directors of said corporation to obtain more compensation for his said services so rendered by him under said contract of employment than they were worth; and that said plaintiff and the other directors of said corporation in this way mismanaged said corporation and its affairs and was guilty of malfeasance in his said offices of director and president of said corporation, to the loss, damage, and detriment of said corporation and the stockholders thereof; and that said stockholders who received said false, libelous, and defamatory publication or publications so understood the same, and the said defendant intended that they should so understand

the said false, libelous, and defamatory publication or publications.

3. In determining whether words charged are libelous *per se,* they are to be taken in their plain and natural import according to the ideas they convey to those to whom they are addressed; reference being had not only to the words themselves but also to the circumstances under which they were used.

4, 5. The term "overload," used in the expression, in connection with the other matters contained in the letter conveys a definite and positive meaning. The expression itself in its ordinary acceptation means "loaded with too heavy a burden" (Standard Dict.); "to load too heavily" (Webster). The expression has been used as meaning overcharged, as with reference to an electric circuit. We fail, however, to find any authority giving the term a meaning which might be construed in this instance as defamatory on its face in the sense of imputing dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability. The word "overload" must, as we view it, be construed as something of a comparative in which the burden is too great for the carrying capacity or power. In this instance the expression used, "I find the company is overloaded with salary and traveling expenses to the extent of nearly $10,000 per year," rather conveys the sense of the inability of the concern to bear so great a burden of traveling expenses and salary than as imputing misconduct and malfeasance or dishonesty on the part of those in charge or control of the traveling expenses and salary. The most that can be claimed for the assertion is that it expressly declares that the burden of traveling expenses and salary was too great for the business. This might have been brought about through the exercise of the most honest motives or intentions on the part of those in control, even though the same might have been brought about by misguided judgment or oversanguine estimate of the company's ability to accomplish results. A vessel might be honestly

overloaded beyond its carrying capacity with the best of motives on the part of the master; an electric circuit might be overloaded through the honest miscalculation of the engineer. The term "overload" refers rather to the ability of the appliance or conveyance to bear the burden than to the agency by which the overload was directed or made. Giving to the words and terms contained in the sentence here complained of their ordinary meaning and acceptation, the whole sentence conveys one idea, namely, the business of the company was not sufficiently ample to carry the expenditure of $10,000 per year. The very next sentence in the letter emphasizes this idea, for there the author says: "This expense account should be reduced to $5,000 per year." Nowhere in the sentence claimed as libelous, and from no expression or term therein used, is the sense conveyed, by the ordinary acceptation of the terms, that either the directors of the corporation or appellant as one of them was guilty of malfeasance in such office; no word or expression contained in this sentence, when taken in its ordinary acceptation, conveys the idea that the appellant here had taken advantage of his office as a director or as president of the corporation or of his position as a member of the executive committee or of the confidence or trust reposed in him by the other directors to obtain more compensation for his services than they were worth. The fact that the author of the letter charged that the corporation was overloaded with traveling expenses and salary in no wise could be distorted into a meaning which would even impliedly place a value on or detract from the value of the services of any one.

A general agent's service might be worth a million dollars a year and a peanut butcher might attempt to employ him at such salary; but, if the income failed to meet the salary or was not commensurate with the outlay, it would appear to us far-fetched in the extreme to say that libel against the agent might be charged to one who asserted that the peanut butcher's business was overloaded with salary and traveling expenses. Neither

would such expression, in our judgment, detract from the qualifications, business ability, honesty or integrity of the party whose services as an agent had been retained.

6. It is true that any false and malicious writing published of another is libelous *per se* when its tendency is to render the party contemptible or ridiculous in public estimation or expose him to public hatred or contempt. (Cooley on Torts, p. 401.) Words or expressions that tend to lower a man in the estimation of his acquaintances or detract from the confidence of his neighbors that he has enjoyed have in some instances been held to be libelous *per se;* but the accusation that a business was not of sufficient extent to bear a burden of salary and traveling expenses to the extent of a definitely named amount, where no dishonest motives are charged in the creating of such salary or traveling expenses, fails to meet this test.

Words or expressions actionable *per se* can only attain that dignity from their natural import and meaning according to the ideas they are calculated to convey to those to whom they are addressed, and in this respect reference must be had, not only to the words or expressions themselves, but also to the circumstances under which they were used. In applying this test, courts in general have held that the words or expressions complained of and alleged to be libelous must receive a fair and reasonable construction, one in conformity with the ordinary use and import attached to them in the community in which they were published. (*Reid* v. *Providence Journal Co.,* 20 R. I. 120, 37 Atl. 637; *Harkness* v. *Chicago Daily News,* 102 Ill. App. 163; *Wilcox* v. *Moon,* 63 Vt. 481, 22 Atl. 80.)

In the case of *Herringer* v. *Ingberg,* 91 Minn. 71, 97 N. W. 460, the court had before it the question of the libelous nature of the following expressions:

"(1) 'I hope that Herringer can for his own sake prove that he has had nothing to do with the management of said ditch, as those county officials that have proven

their incapability to manage the county affairs should not be reelected to continue similar failures.'

"(2) 'Why should the poor farmers along the ditch be compelled to pay more than the state does for such work? Are they more able than the whole state? It looks as though the county officials who were in charge of the matter had that opinion, if Mr. C. Tvedt, backed by J. C. Norby, and others, had not come in on the day the contracts were made and bid the price down to six, seven and eight cents per cubic yard the whole ditch would probably have been let out at eleven cents per cubic yard, causing an additional cost of several thousand dollars.' "

The analysis resorted to by the court in that instance impresses us here. There the court dwelt at length upon the import and meaning of the expressions used, and said:

"The question is: How would persons of ordinary intelligence understand the language? In this view we are of opinion that the article complained of is not libelous. The matters particularly complained of impute to plaintiff neither dishonesty nor corruption, nor that he had connived to defraud the farmers out of thousands of dollars. It does not matter that the complaint so charges, for alleged defamatory words cannot be made broader, nor their natural meaning extended, enlarged, or restricted, by innuendo."

In dwelling upon the general proposition, the court said:

"In determining whether a given publication is libelous, the language thereof must be taken in its ordinary signification, and construed in the light of what might reasonably have been understood therefrom by the persons who read it."

In that case the court referred to its former decision in *Stewart* v. *Minnesota Tribune Co.,* 40 Minn. 101, 41 N. W. 457, 12 Am. St. Rep. 696, holding in effect that, in order to constitute an assertion as libelous *per se,* the nature thereof must be such that the court can

legally presume that the party has been injured in his reputation or business or in his social relations or has been subjected to public scandal, scorn, or ridicule in consequence of the publication, and to the case of *McDermott* v. *Union Credit Co.,* 76 Minn. 84, 78 N. W. 967, 79 N. W. 673, wherein it was declared that:

"Any discommendatory language used of and concerning a person is liable to do him injury, although such injury is often inappreciable in law. But nothing is better settled than that much discommendatory language, whether written or spoken, is not actionable *per se,* because not calculated to do the person of whom it is published any injury appreciable or cognizable by the law. The courts have, for practical reasons and considerations of public policy, to draw the line somewhere, and this has often to be done by a gradual process of exclusion and inclusion, depending upon the particular facts of each case as it arises."

In the case of *Urban* v. *Helmick et al.,* 15 Wash. 155, 45 Pac. 747, the matter complained of as being libelous was in the following language:

"I am a strong believer in the old saying, 'Live and let live,' but in some localities there are hogs, called business men, that want it all. I believe in buying at home and building up our own trade and town as much as possible, as the more business we do the more money there is circulated at home. We have a hotel here that does not believe in that kind of business and will not trade at home, but sends to Seattle for supplies. As this hotel gets most of its money from traveling salesmen who come to Sedro, I wish to say to them that I will not buy any goods of them or the house they represent if they stop at the Hotel Sedro from now on," etc.

By way of innuendo, the complaint alleged:

"Defendants meant to be understood, and were understood by all of the friends, acquaintances, and patrons of these plaintiffs and by the readers of said newspaper and by the public generally, to charge these plaintiffs as individuals and in the management of their said hotel

business with being 'hogs,' thereby meaning that these plaintiffs as individuals and in the management of said business were possessed of and controlled and actuated by the low, dirty, groveling, grasping, gluttonous, self-seeking, and selfish instincts and characteristics of hogs or swine," etc.

There, as here, a demurrer having been sustained, appellants elected to stand upon their complaint, and, having refused to amend, judgment was given dismissing the action. The court, after commenting on the absence of an allegation of special damages, dwelt at length on the contention that the language was libelous *per se.* Quoting approvingly from 1 Boone on Code Pleading, sec. 163, they said:

"The plaintiff cannot, by innuendoes, extend the meaning beyond what the words justify in connection with the extrinsic facts. And when the innuendo is not justified by the antecedent facts referred to, so that without it the words are not actionable, a demurrer to the complaint will lie."

The court after analyzing the language said:

"To accuse one of being deficient in some quality which the law does not require him as a good citizen to possess it not libelous *per se.* The public may disapprove appellants' conduct in thus exercising the right to trade outside the town where they reside, but the publication does not expose them to hatred or contempt in the sense nor to the degree required by the law of libel."

In the case of *Morgan* v. *Halberstadt,* 60 Fed. 592, 9 C. C. A. 147, quoted from approvingly in the case of *Urban* v. *Helmick, supra,* the Circuit Court of Appeals for the Second Circuit approvingly quoted from *Rue* v. *Mitchell,* 2 Dall. 58, 1 L. Ed. 288, where, dwelling upon the question of language libelous *per se,* it is said:

" 'The sense in which words are received by the world is the sense which courts of justice ought to ascribe to them,' on the trial of actions such as this."

The court by way of comment referred to authorities holding:

"That the language used must be given its ordinary meaning; that the test is whether, in the mind of an intelligent man, the language naturally imports a criminal or disgraceful charge; that the language is to be understood by the court in the sense in which the world generally would understand it, giving to the words their ordinary meaning; that the language is to be understood in the ordinary and most natural sense; and that, when the writing complained of is plain and unambiguous, the question in a civil action, whether it is a libel or not, is a question of law."

7. It is, we think, a correct statement of the law that language or terms which are not libelous *per se*—that is, when viewed in the light of their general acceptation and understanding in the community or vicinity in which they are used—cannot be made so through the function or force of an innuendo.

"It is the office of an innuendo in pleading," says the court in *Pandow* v. *Eichsted*, 90 Wis. 298, 63 N. W. 284, "to point out the meaning of the alleged slanderous words, where they are not actionable upon their face, so as to show in connection with the inducement, and in the light of the facts and circumstances under which they were spoken, that the words are actionable."

Mr. Cooley, in his work on Torts, quotes approvingly from the case of *McLaughlin* v. *Fisher*, 136 Ill. 111, 24 N. E. 60, to the effect:

"It is not permissible to enlarge and extend the meaning of the words spoken, beyond their natural import, by the innuendo, except so far as such enlarged meaning is warranted by prefatory matter set forth in the inducement or colloquium. An innuendo is properly used to point the meaning of the words alleged to have been spoken, in view of the occasion and circumstances, whether appearing in the words themselves, or extraneous prefatory matters alleged in the declaration. * * * If * * * the words alleged to have been spoken are not slanderous *per se*, or if they do not refer

to the plaintiff, or if they require explanation by some extrinsic matter to render them actionable, such extrinsic facts must be alleged by way of inducement, and thus render the charge intelligible and certain."

Commenting on this, the learned author says:

"The innuendo cannot change, enlarge, extend or add to the sense or effect of the words declared on, or properly impute to them a meaning, which the publication, either in itself, or taken in connection with the facts stated in the inducement and colloquium, does not warrant or fairly imply. If the words are incapable of a defamatory meaning, they cannot be made so by innuendo. (Cooley on Torts, 3d ed. p. 414.)

8. The innuendo will not introduce new matter, nor will it be permitted to aid to the extent of enlarging the meaning of the words or expressions used. (Odgers on Libel and Slander, 5th ed. p. 116.)

"The innuendo," says the author last cited, "must not put upon the defendant's words a construction which they will not bear. It cannot alter or extend the sense of the words, or make that certain which is in fact uncertain."

9. Many courts have attempted to formulate a rule by which may be distinguished words or expressions actionable *per se* from those which are actionable *per quod.* Without attempting to follow this example, we think it may be safely stated that words or expressions are actionable *per se* when their injurious character is a fact of common notoriety and generally so understood where the utterance is published. Words or expressions libelous *per quod* are such as require that their injurious character or effect be established by allegation and proof. (*McDonald* v. *Lee,* 246 Pa. 253, 92 Atl. 135, L. R. A. 1916B, 915.)

A case quite illuminative of the question here to be determined is that of *Mudd* v. *Rodgers,* 102 Ky. 280, 43 S. W. 255. There, as here, the case turned upon the question of the language used being actionable *per se.*

In the case of *James* v. *Rutletch,* decided by the Court of the King's Bench in 1599, we are afforded an opportunity of observing how the question was viewed by jurists of the earlier school. There it was held:

"That in every action on the case for slanderous words, two things are requisite: (1) That the person who is scandalized, is certain. (2) That the scandal is apparent by the words themselves. * * * ` For the office of an innuendo is to contain and design the same person who was named in certain before, and in effect stands in lieu of a prædict, but an innuendo cannot make a person certain who was uncertain before. For it would be inconvenient, that action should be maintained by imagination of an intent which doth not appear by the words upon which the action is grounded, but is altogether uncertain and subject to deceivable conjecture. * * * As to the second, as an innuendo cannot make the person certain which was uncertain before, so an innuendo cannot alter the matter or sense of the words themselves." (*James* v. *Rutletch,* 2 Coke's Rep. 305.)

Another English case which we find and which we think is illuminative of the earlier and fundamental rule applicable to the question here presented is that of *Mulligan* v. *Cole et al.,* 44 L. J. Q. B. 153. There the plaintiff appears to have been an art master and had been such at the Walsall Science and Art Institute. His engagement had ceased with that institution, and he then became master of another school which was called the Walsall Government School of Art. The following advertisement appeared in a publication called the Walsall Observer, signed by the defendants as chairman, treasurer, and secretary of the institute, respectively:

"Walsall Science and Art Institute. The people are informed that Mr. Mulligan's connection with the institute has ceased, and that he is not authorized to receive a subscription on its behalf."

By way of innuendo the plaintiff alleged that this meant that the plaintiff falsely assumed to be authorized to receive subscriptions on behalf of the said institute.

It was held that a nonsuit was properly entered because the advertisement was not capable of any defamatory meaning.

10. As a general proposition of law applicable to pleadings in cases of this character, if the words or expressions complained of are ambiguous or equivocal, the innuendo may assign the true meaning the plaintiff believes them to bear; but if the words alone, or the words limited by circumstances duly pleaded, are not defamatory, the innuendo cannot make them so. (*Cooper* v. *Seaverns,* 81 Kan. 267, 105 Pac. 509, 153 Am. St. Rep. 359, 25 L. R. A. n. s. 517; *Feast* v. *Auer,* 90 S. W. 564, 28 Ky. Law Rep. 794, 4 L. R. A. n. s. 560.)

11. Viewing the question from another angle, we think a rule applicable to the subject may well be stated thus: Words are actionable *per se* which directly tend to the prejudice of any one in his office, profession, trade, or business. But even under this general assertion of the rule it does not follow that all words to the disparagement of an officer, professional man, or one engaged in a trade or business, will for that reason, without proof of such damage, be actionable in themselves.

Mr. Newell, in his work on Slander and Libel, says:

"When language is used concerning a person or his affairs which from its nature necessarily must, or presumably will as its natural and proximate consequence, occasion him pecuniary loss, its publication *prima facie* constitutes a cause of action and *prima facie* constitutes a wrong without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the terms 'actionable *per se*,' etc. Therefore, the real, practical test by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation, is whether the language is such as necessarily must or naturally and presumably will occasion pecuniary damage to the person of whom it is spoken." (Newell on Slander, 2d ed. p. 181.)

12. To this assertion of the law we deem another rule

applicable; *i. e.,* the actionable words or assertions must refer to the party bringing the action, at least with reasonable certainty. In the case at bar, even applying the broadest meaning and significance to the term used, and taking it in the most favorable light presented by the innuendo and under conditions delineated by the colloquium, it would require a distorted application and a strained construction of the language used in the letter complained of to bring such language into the category of expressions actionable *per se* with reference to the appellant.

Much reliance is placed by appellant in the case of *Peterson* v. *Western Union Telegraph Co.,* 65 Minn. 18, 67 N. W. 646, 33 L. R. A. 302. There the defendant, the Western Union Telegraph Company, received at its office in New Ulm and transmitted a message over its telegraph line, addressed to the plaintiff in that case, in which message appeared the words:

"Slippery Sam, your name is pants.
[Signed] Many Republicans."

The court held that the message was on its face fairly susceptible of a libelous meaning, saying:

"The sting is in the word 'slippery.' This word, when used as descriptive of a person, has a well-understood meaning. It means, when so used, that the person to whom it is applied cannot be depended on or trusted; that he is dishonest and apt to play one false. (Cent. Dict.) If such is the meaning of the word as used in this message—and of this the jury were the judges—it was clearly libelous, because, if a man is dishonest, and apt to play one false, he merits the scorn and contempt of all honorable men. To falsely publish of a man that he is slippery tends to render him odious and contemptible. Such a publication is a libel."

There is a wide difference between that case and the one at bar. Had the letter in question as published by respondent declared that appellant had overloaded the insurance company with unauthorized salary and traveling expenses, then there might be some ground upon

which to base this analogy. In the Peterson case, the term "slippery" was applied to the plaintiff with all the force and effect that the ordinary acceptation of that term conveyed—undependable, dishonest, false dealing, etc. In the case at bar, the term "overload" is directly applied to the company, and even a strained construction of the term, if such construction were permissible, would not convey the idea of wilful wrongdoing on the part of any one. The whole sense conveyed by the expression, taken in connection with the full context of the letter complained of, when put in homely language, was that the burden of expense was too great for the present capacity of the corporation; the expression "is overloaded" was impersonal. The language was not actionable *per se.*

With a view to supporting his contention that the language complained of in this letter was libelous *per se,* appellant refers us to many other cases decided in the several jurisdictions. We proceed to analyze some of these, inasmuch as in our judgment they rather support our conclusion reached in this matter.

In the case of *McKinney* v. *Roberts,* 68 Cal. 192, 8 Pac. 857, the actionable words charged a woman with being a "paramour" of a man not her husband. Here was a term commonly understood to impute lack of chastity. The published article referred specifically to a given person.

In the case of *Indianapolis Journal* v. *Pugh,* 6 Ind. App. 511, 33 N. E. 991, the libelous matter charged a woman with having traveled with a married man for five months as his wife and that she was turned out of a hotel, and that their relations had caused sensation where it transpired. Here was a direct charge of conduct impugning chastity.

In *Newman* v. *Stein,* 75 Mich. 402, 42 N. W. 956, 13 Am. St. Rep. 447, the action was for slander. The actionable language was spoken directly to the plaintiff in the presence of others. Vile, opprobrious epithets were used, imputing want of chastity.

In *Dennis* v. *Johnson,* 42 Minn. 301, 44 N. W. 68, the libelous matter was by way of graphic demonstration by which a party's faithfulness and honesty as builder and architect was impugned; but the party was specifically named and referred to.

In *Hetherington* v. *Sterry,* 28 Kan.. 426, 42 Am. Rep. 169, the publication specifically named a party, designating his former official capacity as city attorney, and detailed advice given and directly charged abandonment of his client.

In *Steele* v. *Southwick,* 9 Johns. (N. Y.) 214, the case arose out of a published statement specifically designating a party by a term of common knowledge and repute, *i. e.,* "the man at the Sign of the Bible," and directly charging "is no slouch at swearing falsely."

In *Riley* v. *Lee,* 88 Ky. 603, 11 S. W. 713, 21 Am. St. Rep. 358, the question was as to a published article setting forth in unmistakable language the direct charge of a false utterance alleged to have been made by the plaintiff.

In *Sanderson* v. *Caldwell,* 45 N. Y. 398, 6 Am. Rep. 105, there was specific reference to the plaintiff, calling him by name, mentioning acts done in "his sober moments," then charging the collection of "blood money" a "big thing," thus imputing extortionate conduct in his profession.

Many other cases of like significance might be referred to as signifying what courts have held to be language libelous *per se.* None of them are analogous to the case at bar. In each of the cases to which we have last referred, language is used designating a given person with reasonable certainty and terms or assertions are resorted to in the libelous utterance imputing attributes which, with reference to the person, either by reason of the common use made of the term within the locality or the acceptation of the term or assertion generally, would naturally tend to degrade him in the estimation of his fellow men, or hold him out to ridicule or scorn, or would tend to injure him in his business, occupation, or profession.

**13.** It is contended by appellant that, even though the language used in the letter complained of was not libelous *per se,* no allegation of special damages was necessary. It is sufficient to say in this respect that all of the authorities to which we have referred, and indeed many others, support the proposition that where the language complained of is not libelous *per se,* special damages must be alleged.

In Ruling Case Law, it is asserted thus:

"The general rules applicable in pleading damages generally apply to actions for libel or slander. In such cases it is necessary for the plaintiff to allege in his petition, as well as to prove, special damages before he is entitled to recover, unless the defamatory words in action are actionable *per se.*" (17 R. C. L. 391.)

We find this text amply supported by eminent authority. (*Tracy* v. *Hacket,* 19 Ind. App. 133, 49 N. E. 185, 65 Am. St. Rep. 398; *Gustin* v. *Evening Press Co.,* 172 Mich. 311, 137 N. W. 674, Ann. Cas. 1914D, 95.)

**14.** It is the contention of appellant that, even though it be held that an allegation of special damages was necessary to make the pleading good as against demurrer, his allegation in this respect is sufficient to comply with such a rule. The allegation of damages, as we view it, is contained in paragraph 9 of the complaint. There it is averred:

"That by means of said false, libelous and defamatory publication or publications the plaintiff herein was injured in his reputation and good name and standing to his damage in the sum of $50,000."

No allegation of special damages, as such is understood in the law of pleading, is here set forth.

The order of the trial court in sustaining the demurrer is affirmed.

It is so ordered.

ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied.