LAS VEGAS SUN, INC., A NEVADA CORPORATION; HERMAN MILTON GREENSPUN; ED REID, APPELLANTS, v. GEORGE E. FRANKLIN, JR., RESPONDENT.

No. 4034

September 15, 1958.                    329 P.2d 867.

(Rehearing denied October 15, 1958.)

*Welch, Mott & Morgan,* of Washington, D. C.; *Springmeyer & Thompson,* of Reno; *Morton Galane,* of Las Vegas, for Appellants.

*Jones, Wiener & Jones,* of Las Vegas, for Respondent.

## OPINION

By the Court, MERRILL, J.:

This appeal is from judgment for damages for libel. The judgment, entered pursuant to jury verdict, was for $190,000: compensatory damages of $40,000 plus punitive damages of $150,000.

The alleged defamation appeared in a newspaper article. The issues with which we deal in this opinion arise out of three contentions of the appellants. First: that the article was improperly held by the trial judge to be libelous per se; Second: that in any event it was true; Third: that through error committed by the judge appellants were precluded from presenting to the jury evidence in mitigation of damages.

The article in question appeared in the Las Vegas Sun, a newspaper of general circulation published in Las Vegas. Appellant Greenspun was publisher of the paper. Appellant Reid was author of the article.

The article was the fourth in a series relating to respondent Franklin. The libelous statements are found, not in the body of the article, but in its headline and tagline. The headline read, "BABIES FOR SALE. FRANKLIN BLACK MARKET TRADE OF CHILD TOLD." The tag-line read, "TOMORROW—BLACKMAIL BY FRANKLIN." The body of the article factually recited the manner in which Franklin had secured the relinquishment of a baby for adoption.

The trial judge instructed the jury that the article was libelous per se. Appellants contend that this was error. They assert that the language was ambiguous, of doubtful import and susceptible of more than one interpretation. Accordingly, they contend, the question of whether a defamatory meaning was to be drawn from the article should have been left to the jury. We find no merit in this contention.

While persons may well differ in a precise or detailed spelling out of the terms "black-market sale" or "blackmail," this fact does not relieve the language of its

defamatory nature. Under any reasonable definition such charges would tend to lower the subject in the estimation of the community and to excite derogatory opinions against him and to hold him up to contempt. A defamatory meaning would be conveyed to the typical reader in accordance with the common usage of the language. The statement was, then, defamatory. Talbot v. Mack, 41 Nev. 245, 169 P. 25; Reynolds v. Arentz, 119 F.Supp. 82 (D.Nev. 1954). See Prosser on Torts, p. 574, § 92; Restatement of The Law, Torts, Vol. 3, § 559, p. 140. In Talbot v. Mack, supra, at p. 262, this court stated, "In determining whether words charged are libelous *per se,* they are to be taken in their plain and natural import according to the ideas they convey to those to whom they are addressed; reference being had not only to the words themselves but also to the circumstances under which they were used."

Appellants contend that the headline and tagline cannot be considered apart from the context in which they were used. Thus, they contend, the headline must be qualified by and read in the light of the article to which it referred and the tagline must be qualified by and read in the light of the subsequent article to which it referred.

This is not so. The text of a newspaper article is not ordinarily the context of its headline, since the public frequently reads only the headline. Fitch v. Daily News Publishing Co., 116 Neb. 474, 217 NW 947, 59 A.L.R. 1056; Shubert et al v. Variety, Inc., 128 Misc.Rep. 428, 219 N.Y.S. 233. See Restatement of the Law, Torts, Vol. 3, § 559, comment (d). The same is true of a tagline or leader, since the public frequently reads only the leader without reading the subsequent article to which it refers. The defamation of Franklin contained in the headline was complete upon its face. It was not necessary to read the article in order that the defamatory nature of the statement be understood or connected with Franklin. The same is true of the tagline.

We conclude that the trial judge properly instructed the jury that the article was libelous per se.

This conclusion also disposes of appellants' contention that there was a failure of proof of special damages. The statement being libelous per se, proof of special damages was not necessary. Talbot v. Mack, supra; See 53 C.J.S. 268, § 170(b).

Appellants have pleaded the defense of justification— that the libelous statements were in fact true. They here contend that they have proven truth so conclusively that it may be said to have been established as a matter of law.

As to the charge of a black-market sale of a child, this defense raises two separate issues for our consideration. First: whether the manner in which Franklin handled the transaction to which the article referred was according to law; Second: if it was not, whether this constituted the transaction a black-market sale of a child as that term is generally to be understood.

The material facts are not in dispute. Franklin, an attorney, was approached by a Las Vegas doctor. He was advised of the imminent birth of a child to an unwed woman and of the fact that the woman was considering giving the child for adoption. He was advised that a certain married couple wished to adopt the child and were willing to pay the expenses of confinement and compensation to the mother for loss of wages due to confinement.

He interviewed the expectant mother in a local hospital, learned that the child was not yet born, advised against adoption but left his name in the event that adoption should be decided upon.

After birth of the child the mother, accompanied by her stepmother, voluntarily came to Franklin's office and discussed the adoption with him. She agreed to an adoption with the adopting parents assuming the expenses of confinement and compensating her for loss of wages in the sum of $300. A consent to adoption was prepared by Franklin.

Accompanied by her stepmother and by Franklin's daughter, the mother of the child took the document from Franklin's office to a notary public where it was executed and delivered to Franklin's daughter.

The consent did not disclose the names of the adopting parents. Upon its face it appeared to give consent to an adoption by specified persons. The consent, however, was in blank when signed and acknowledged. The names of the adopting parents were filled in later by Franklin. Franklin received a fee for his services from the adopting parents in the sum of $100, less expenses.

Later the mother and father of the child were married and sought to revoke the consent and to obtain from Franklin the names of the persons with whom the child had been placed. Franklin refused to make disclosure.

Our first question under these facts is whether a consent to adoption signed in blank is recognized as proper under Nevada law. Franklin contends that it is, relying upon the case of Ex Parte Schultz, 64 Nev. 264, 181 P.2d 585.

The applicable sections of our statutes in pertinent part read as follows: NRS 127.040. "Written consent to the specific adoption proposed by the petition," sworn to "by the person or persons consenting, shall be required from . . . (c) the mother only of a child born out of wedlock; . . ."

NRS 127.050 "The following may accept relinquishments for the adoption of children from parents and guardians and may consent to the adoption of children: 1. The state welfare department, to whom the child has been relinquished for adoption; 2. A corporation organized and existing under and by virtue of the laws of the State of Nevada as a child-caring agency, to whom the child has been relinquished for adoption; or 3. Any child-placing agency authorized under the laws of another state to accept relinquishments and make placements, to whom the child has been relinquished for adoption."

These sections, as we construe them, contemplate two methods of placing a child for adoption. 1. By direct

action of the natural parents; 2. Through the state welfare department or a recognized child-caring or child-placing agency.

By the first method the parents, through granting of "consent to the specific adoption proposed by the petition," in effect select the adopting parents—the persons who are to have their child. By the second method the child is relinquished by the parents to an agency with the intent that the agency act in place of the parents in selecting the adopting parents.

The statute, however, does not provide for any relinquishment for purposes of placement other than to an agency as specified. To none but such an agency can parents irrevocably grant authority to select for them the adopting parents of their children. A "consent to the specific adoption" under NRS 127.040 must, then, constitute an approval of the adopting parents. Their identity must be made known.

Franklin contends for a different statutory construction. In his view the "specific adoption" contemplated by the statute is the adoption of a specific child. In support of his position he points to the fact that in the Schultz case relinquishment in blank to an agency was upheld.

The Schultz case dealt with an agency placement and not with direct parental consent. Further it may be noted that the statute before us was enacted in 1953 after the decision in the Schultz case was rendered. Then for the first time do we find the requirement that consent be to "the specific adoption proposed by the petition." The legislative intent to be read from this act would seem to be that notwithstanding the holding of the Schultz case as to agency placements, the compelling implication of the statutory language shall apply to all cases of direct parental consent.

Under Franklin's construction a consent in blank in effect would become a blanket relinquishment with authority in the bearer of the instrument, whether an agency or an individual, to act in the stead of the natural parents in the selection of the adopting parents. Since relinquishment for placement is specifically limited by

the subsequent section we cannot credit the legislature with such inconsistent intent.

Franklin emphasizes the policy, recognized by the Schultz opinion, that it is not desirable that the identity of the adopting parents be disclosed to the natural parents. We continue to recognize such policy and have no intention of frustrating or reflecting upon it. It can be carried into effect by relinquishment to an agency as the Schultz case demonstrated.

We recognize also, however, that the legislature as a matter of policy has acted to establish safeguards and controls in nonagency placement of children for adoption with the apparent view that such controls are desirable in the public interest. Such controls in the normal case may well be wholly unnecessary. However, without some measure of control, consents in blank in the hands of unscrupulous persons could reduce children of adoption to the commercial status of negotiable paper. In no event may we disregard the apparent legislative intent in this regard.

We conclude that the procedure followed by Franklin in the case to which the libelous article referred was not in accordance with Nevada law.

Since it appears from the record before us that this procedure was common practice in Clark County, it may be well for us to make clear the extent of our ruling upon this point lest it be regarded as invalidating all adoptions based upon consents in blank. We do not hold such consents to be void. Whether they are void, or merely revocable until acted upon by a court in adoption proceedings, remains to be determined in a case where the question is properly at issue.

Does it follow from the fact that Franklin was not proceeding according to law that he was engaged in the "black-market" sale of a child? It does not. The vice of the procedure followed by Franklin does not lie in the fact that it constitutes a black-market sale but in the fact that such procedure, if permissible, would open the door to black-market sales.

Under any reasonable construction of the term, "black-

market sale" contemplates a sale contrary to regulations with a profit calculated either to compensate for the risk of apprehension or to match the buyer demand which has created the market. In the case before us the fact that the consent was not properly secured is not enough to constitute the transaction a black-market sale in the absence of proof of a sale price or profit or that the law was deliberately disregarded in consideration for the attorney's fee.

The record would indicate that Franklin's failure to follow the requirements of statute was through his innocent misconstruction of the statute in the light of an earlier decision of this court.

Appellants contend that the compensation paid for loss of wages amounted to a profit and constituted the transaction a sale. In absence of statute the determination of whether such compensation was proper rested in the first instance with the jury. We shall not disturb their determination, implicit in their verdict, that such compensation did not constitute the transaction a sale. There is nothing to indicate that the payment permitted the mother to profit from childbirth. To the contrary, it would seem to have been intended simply to prevent her confinement from resulting in pecuniary loss.

Appellants also contend that they have conclusively established the truth of the tagline.

The "blackmail" to which the tagline referred was contained in a letter from Franklin to the child's mother in response to her notice of revocation of consent to adoption. The statement by Franklin was as follows: "I feel that I must acquaint you with the fact that I am aware of certain developments which can only burden you if you continue to pursue your present course."

Appellants construe this language as a threat to oppress the mother with "wrongful, unlawful, extra-legal pressures." Even should we accept this construction as a reasonable one (which we are reluctant to do), it cannot be said to be the only reasonable one. The language might well be construed simply as a warning that Franklin was in possession of facts which would make it difficult for the mother to prevail in her chosen course of action.

We cannot, then, hold as a matter of law that the statement constituted blackmail. Whether Franklin was in fact guilty of blackmail, and the tagline therefore true, remained a question of fact for the jury. Its determination upon this issue will not be disturbed.

We conclude that neither as to the headline nor the tagline have appellants established the defense of truth as a matter of law.

Appellants' final contention is that, through errors at law committed by the trial judge, they were precluded from presenting to the jury evidence in mitigation of damages and to disprove malice. We have concluded that this contention has merit and requires reversal.

The verdict for punitive damages in the sum of $150,000 clearly demonstrates the view of the jury that the defamation was actuated not by righteous indignation in the public interest but by personal malice of such a character as to constitute grave aggravation. Appellants' most potent defense against the assertion of malice lay in their contentions that Franklin was not proceeding according to law; that in the public interest the practice he was following should be halted; that in airing the facts and commenting thereon they were motivated by legitimate public concern rather than by private and personal malice.

There was evidence from which the jury could have concluded that the libel was prompted by personal malice. If a fair and considered judgment as to the existence and extent of malice and aggravation was to be had it was essential that full consideration be given to the mitigating circumstances upon which appellants relied and that aggravation and mitigation be judiciously weighed against each other. Appellants were not permitted to establish their propositions effectively.

In the first place it is apparent from the record not only that the jury was not instructed as to the law with reference to consents in blank, but that it was led to believe that Franklin was proceeding according to law.

Over repeated objections three attorneys were permitted to testify as to the practice which they followed

in securing consents to adoption. They all testified that they followed the practice which Franklin had followed. This testimony by itself might have had some materiality as tending to establish Franklin's innocence of motive. The inquiry was not confined to any such issue, however.

Counsel on both sides (through their examinations) and the judge himself (through his rulings and comments) all appeared to recognize that the function of the bulk of this testimony was to establish the state of the law relative to consents in blank by means of expert testimony in the absence of any ruling by this court on the question.

The witnesses were examined as experts on the subject of the law. Each was qualified as an expert witness would have been qualified. Each was shown to be an outstanding member of the bar. One was a former district judge. Hypothetical questions were asked and answered. Foundation was laid to the effect that the witnesses were familiar with the law of Nevada. Answers were given in the light of such knowledge.

This testimony, taken in its entirety, could only have been regarded by the jury as having been presented for the purpose of establishing the state of the law.

Any prejudice or misunderstanding might well have been overcome had the judge properly instructed the jury upon the law. This was not done. An instruction was proposed by appellants and was refused by the judge. While error in this particular respect is not available to appellants through their failure to take exception to the judge's action, the inevitable result was to impel the jury to an erroneous conclusion as to the law upon this vital point and to a conviction that Franklin was acting in accordance with law. A fair appraisal of the extent of malice and aggravation was thus rendered impossible.

We conclude that it was prejudicial error to admit the testimony of the three attorneys as expert witnesses upon the issue of the state of the law, an area of determination which the judge should have reserved to himself.

Further, evidence offered by appellants in mitigation of damages was improperly excluded as hearsay.

Greenspun testified as to research he had conducted into the problem of black-market operations in adoption proceedings. As a result of such research, he testified in effect, he had concluded that public welfare demanded that the practice as followed by Franklin should be halted. The evidence excluded would have served to demonstrate the extent of his research and to explain his conclusions.

He testified to having interviewed the counsel for a United States Senate subcommittee investigating the subject of adoption rackets. He was not permitted to relate the substance of the conversation.

He testified to having read an article in the March 1950 issue of the Yale Law Journal entitled "Moppets On The Market." He was not permitted to introduce the article itself in evidence.

He testified to a study of the Nevada Foster Homes Act, NRS 424.010 et seq., and that he had drawn certain conclusions from it. He was not permitted to read the law to the jury or state the conclusions he had reached.

He offered in evidence a memorandum from Reid with respect to a conversation between Reid and the attorney general of Nevada relative to adoption procedures. The offer was refused.

These items of evidence did have hearsay aspects or aspects of irrelevancy. They were not competent to establish the state of the law or of public policy. They could not be permitted to invade the province of judge or jury. They were, however, competent and material upon the question of the *bona fides* of Greenspun's beliefs as to the public importance of adoption rackets.

The trial judge does have power to exercise control

over the extent to which cumulative evidence of this sort is to be permitted to encumber the record. Rejection of the evidence, however, was not upon the basis of any exercise of discretion of this sort, but was based upon the incompetency of the evidence.

The jury was thus deprived of evidence which would have assisted it to judge of the justification for Greenspun's beliefs and the good faith of his motives in publishing the article in question. Admission for such limited purpose under appropriate judicial instructions would have been proper. The jury could have been told that the evidence was not proper to establish the truth of the statements contained in the exhibits but that it might be considered in determining whether Greenspun had relied upon them and in judging of the justification for such reliance. Sollars v. State, 73 Nev. 248, 316 P.2d 917; Kimble v. First National Bank of Nevada, 73 Nev. 25, 307 P.2d 615.

Finally the court erred in instructing the jury to the following effect: "Failure to prove a plea of truth may be considered as evidence of express and continued malice."

There is authority to support the giving of this instruction. In our view, however, the better rule is that failure of proof of truth is not itself evidence of malice. Where malice appears a plea of truth may be considered in aggravation of damages as an unprivileged republication of the original libel. However, to constitute such aggravation it should appear that the defense of truth was not pleaded in good faith. When the defendant actually believes his plea to be true and offers evidence in support of it in good faith, the rule should not apply to penalize him simply because the evidence fails to convince the jury. Rather, in such a case, the evidence offered should operate in mitigation of damages. Crane v. New York World Telegram Corp., 308 N.Y. 470, 126 NE.2d 753, 52 A.L.R.2d 1169; Snyder v. Fatherly, 153 Va. 762, 151 SE 149.

With reference to malice, then, the question posed by a plea of truth is not whether the jury has been satisfied that the libelous statement was true and thus justified. The question, rather, is whether the defendant in good faith believed it to be true. If he did, his belief and his reasons for it can operate in mitigation. If he did not, his false plea can operate in aggravation.

Reversed and remanded for new trial.

BADT, C. J., and EATHER, J., concur.