DEIRDRE HARRISON, Plaintiff-Appellee, v. CHICAGO SUN-TIMES, INC., d/b/a The Chicago Sun-Times, Defendant-Appellant.

First District (1st Division) No. 1—02—0256

Opinion filed June 30, 2003.

556

Damon E. Dunn and Maria D. Elliott, both of Funkhouser, Vegosen, Liebman & Dunn, Ltd., of Chicago, for appellant.

Lawrence V. Jackowiak, of Law Offices of Lawrence V. Jackowiak, of Chicago, for appellee.

JUSTICE SMITH delivered the opinion of the court:

In May 2000, the Chicago Sun-Times newspaper published an article reporting a federal court ruling in a case that was decided under international child abduction law. In that case, the court ordered that a minor child who was taken from her home in Italy to Chicago by her mother, plaintiff Deirdre Harrison (Harrison or plaintiff), be returned to Italy. Harrison filed a complaint alleging that defendant

Chicago Sun-Times, Inc., d/b/a The Chicago Sun-Times (Sun-Times or defendant) defamed her and placed her in a false light by its statement that she kidnapped her daughter Beatrice. The Sun-Times filed a motion to dismiss the defamation action, which was denied in part and granted in part, then filed a motion to certify three questions for immediate appeal pursuant to Illinois Supreme Court Rule 308. 155 Ill. 2d R. 308. This court is asked to decide: whether the complained-of statement is substantially true; whether the statement, contained in a front-page "leader" article, must be read together with an inside article, and if so, whether it is capable of an innocent construction; and whether the statement is a fair report of the district court decision.

## I. BACKGROUND

### A. Factual Background

The facts pertinent to this case were set forth by the United States District Court in the international child abduction action (*Tabacchi v. Harrison*, No. 99 C 4130 (N.D. Ill. 2000) (Tabacchi case or the district court case)) and are as follows.

Harrison met Gian Andrea Tabacchi (Tabacchi) in 1994, in New York City, where they began living together. The following year Harrison and Tabacchi moved to Italy and lived on Tabacchi's family property near Rome. The couple married in 1996 and their daughter Beatrice was born in March 1997. Beatrice had lived her entire life in Italy and was enrolled in school there until her removal to the United States in January 1999.

On January 15, 1999, Harrison, who had earlier argued with Tabacchi, took Beatrice to a neighbor's house. In response to Harrison's announcement that day that she planned to go to the United States with Beatrice, Tabacchi said he would go to the police. Tabacchi drove to the neighbor's house to get Beatrice and attemped to leave with her. In trying to prevent Tabacchi from leaving, Harrison was knocked to the ground by him. Harrison ultimately prevented him from leaving by blocking the driveway with her car and Tabacchi gave Beatrice back to Harrison. The police arrived and Tabacchi inquired about charging Harrison with child abduction. He was told that he could not do so because Harrison was the child's mother and he and Harrison were still married. Harrison later went to the police station to report the assault by Tabacchi. When she left the police station, she saw Tabacchi arrive there with his father. Tabacchi filed a police report which included Harrison's threat to keep him from seeing Beatrice again: " 'I WILL TAKE ALL YOU HAVE, ASSHOLE, YOU WILL NEVER SEE THE CHILD AGAIN.' "

The next day, January 16, Tabacchi went to family court in Rome to try to prevent Harrison from leaving with Beatrice. On a judge's suggestion, Tabacchi went to the police station to have Beatrice's name listed to prohibit her removal from the country. He filed a report at another police station, where he sought to track Harrison, but was told that was not possible. Tabacchi twice called the neighbor with whom Harrison stayed to inquire about Harrison's whereabouts. In the afternoon, the neighbor told him that Harrison and Beatrice were probably on an airplane.

On January 16, Harrison took Beatrice on a flight to London. Harrison did not tell Tabacchi where they were going or when they would return to Italy. While she was still at the airport in Italy, Harrison mailed Tabacchi a postcard in which she informed him only of their departure from Italy and her intention not to keep "total rights or access" to Beatrice from him. The next day, Harrison and Beatrice flew to Chicago, where they lived with Harrison's brother. On January 18, Tabacchi telephoned Harrison at her brother's apartment. Shortly thereafter, Harrison informed Tabacchi that she planned to divorce him. She later filed for divorce and an order of protection in the Illinois courts.

Within one month, Tabacchi filed for separation from Harrison and custody of Beatrice in the Italian courts. In March 1999, Tabacchi filed another document in the Italian courts, complaining of Harrison's conduct and removal of Beatrice, and claiming she falsely accused him of mistreating her (Harrison) to justify taking Beatrice. In Harrison's absence in July 1999, the Italian courts granted Tabacchi's petition for separation, awarded Harrison temporary custody of Beatrice, and required Harrison to return Beatrice to Italy.

### B. Hague Petition

In June 1999, Tabacchi filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Conference on Private International Law, Fourteenth Session, Final Act, done at The Hague, October 25, 1980; Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. 11670, 1343 U.N.T.S. 89 (entered into force December 1, 1983)) (child abduction convention or Hague Convention) in the United States District Court. After holding a bench trial that ended in December 1999, the district court issued a memorandum opinion and order on February 10, 2000 (violation order). The district court's determination was limited to the question of Harrison's wrongful removal of Beatrice under the Hague Convention and did not address the merits of underlying custody issues. Harrison raised defenses under the Hague

Convention, including grave risk of physical or psychological harm to Beatrice if she (Beatrice) were separated from Harrison upon return to Italy due to criminal prosecution of Harrison pending in Italy. Tabacchi testified that he would drop all criminal charges against Harrison and take all possible measures to ensure that Harrison would not face criminal prosecution for leaving Italy with Beatrice. The district court rejected Harrison's defenses and found that Beatrice's habitual residence was Italy and Tabacchi had custodial rights to Beatrice that he was exercising at the time of Beatrice's removal, thus satisfying the requirements for wrongful removal under the Hague Convention. See Hague Convention, ch. I, art. 3; 42 U.S.C. § 11601 (1988).

In the February 2000 violation order, the court did not require Beatrice's immediate return to Italy. Rather, the court made the return conditional upon receiving satisfactory evidence from Tabacchi that he would provide housing and living expenses for Harrison and Beatrice pending the resolution of custody proceedings in Italy. After additional proceedings, on May 11, 2000, the district court issued an order (return order) incorporating the violation order and requiring that Beatrice be returned to Italy by May 25, 2000, pursuant to the Hague Convention and the International Child Abduction Remedies Act. See Hague Convention, ch. III, art. 12; 42 U.S.C. § 11603 (1988).

## C. Sun-Times Article

On Tuesday, May 23, 2000, the Sun-Times reported the outcome of the Tabacchi case. In a front-page column containing references to inside articles, a photograph of Harrison and Beatrice appeared above a two-sentence "leader" article. A headline to the leader, appearing also to be a caption to the photograph, stated, "Kidnapped girl must go home." The leader was printed in a font that appears to be approximately the same size as that used in the text of other articles. It stated: "A woman must return her daughter to Italy, where the girl's father lives, a judge ruled Monday. Claiming she was fleeing an abusive husband, Deirdre Harrison kidnapped Beatrice Tabacchi. Page 16."

The full article on the Tabacchi case appeared on page 16 of the newspaper under the headline, "Judge: Mom must return girl to Italy," and the subheading, "Ruling says woman violated an international treaty on abduction." The text of the two-column article focused on Harrison's relationship with Tabacchi and her response to the ruling. The article summarized the district court case, stating that Tabacchi had filed "a rare Hague petition *** charging his wife violated an international treaty on child abduction and demanding Beatrice's return." Harrison's attorney was cited as saying that allegations of

spousal abuse raised by plaintiff are "largely irrelevant in Hague petition cases." The article explained that the "issue is whether Harrison had her husband's permission to take their child out of the country." Another photograph of Harrison and Beatrice appeared above the article with the caption, "Deirdre Harrison was ordered by a judge to return her daughter, Beatrice Tabacchi, 3, to the child's father in Italy."

Two days later, the Sun-Times printed a correction notice which stated, "A front-page Chicago Sun-Times headline Tuesday incorrectly described the case of a woman ordered to return her daughter to Italy. The woman said she thought it was legal to bring her daughter to the United States to flee a husband she said abused her, and she was not found guilty of kidnapping. Despite that, a federal judge earlier this month ordered her to go back to Italy and work through the Italian court system."

## D. Defamation Action

In April 2001, plaintiff filed a three-count defamation action against the Sun-Times. The first count, for defamation *per se,* was based on the front-page statements "Kidnapped girl must go home" and "Deirdre Harrison kidnapped Beatrice Tabacchi" and alleged that both statements falsely imputed Harrison had committed the criminal offense of kidnapping. See 720 ILCS 5/10—1 (West 2000). It further alleged that the Sun-Times published the statements in bad faith and with actual malice. The second count of the complaint was based on the same two statements and alleged that the Sun-Times placed plaintiff in a false light. A third count for false light was based on the photograph caption on page 16.

The Sun-Times filed a motion to dismiss pursuant to sections 2—615 and 2—619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2—615, 2—619(a)(9) (West 2000)) based on the alleged substantial truth and innocent construction of the statements, and on the fair report privilege for official proceedings. The Sun-Times alleged that the public nature of the district court case and plaintiff's failure to plead actual malice and special damages required dismissal of the two false light counts. The Sun-Times relied upon, among other things, plaintiff's own proposed findings of fact and conclusions of law from the district court case. In that document, plaintiff stated she feared Tabacchi "was going to kidnap Beatrice" and she admitted that she faced criminal prosecution in Italy because Tabacchi accused her of kidnapping Beatrice.

The trial court denied the motion to dismiss as to the first two counts of plaintiff's complaint, but granted the motion as to the third

count for false light, which it dismissed. Shortly thereafter, defendant moved to certify three questions for immediate appeal. 155 Ill. 2d R. 308. In its order granting the motion, the court stated that the questions were certified based on plaintiff's stipulation that a ruling concerning the statement "Harrison kidnapped Beatrice Tabacchi" would be dispositive also of the statement "kidnapped girl must go home."

## II. DISCUSSION

### A. Motion to Strike

■ Plaintiff filed a motion, which was taken with the case, to strike the Sun-Times' reliance on a document (plaintiff's "Proposed Findings of Fact and Conclusions of Law" filed in the district court) that was attached as an exhibit to the motion to dismiss. Plaintiff's argument, that only allegations contained within the complaint itself may be considered on review, is based on her mischaracterization of this appeal as from the denial of a motion to dismiss. Here, however, we consider the questions certified under Rule 308 rather than the denial of the Sun-Times' motion to dismiss. Our review of a permissive appeal under Rule 308 is *de novo*. *Moriarty v. Greene*, 315 Ill. App. 3d 225, 231, 732 N.E.2d 730 (2000). The document that plaintiff maintains cannot be considered was before the trial court and is contained in the record on appeal. See *Dopp v. Village of Northbrook*, 257 Ill. App. 3d 820, 824, 630 N.E.2d 84 (1993) (documents filed in case may be included in record on appeal). Therefore, we deny plaintiff's motion to strike.

### B. Defamation

■ To prove defamation, the plaintiff must show that the defendant made a false statement about the plaintiff, there was an unprivileged publication of the defamatory statement to a third party by the defendant, and the plaintiff was damaged from the publication. *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424, 698 N.E.2d 674 (1998). A statement is considered defamatory *per se* when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed or when its defamatory character is apparent on its face. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10, 607 N.E.2d 201 (1992).

■ Of the five categories of statements recognized to be defamatory *per se*, the one pertinent to this case consists of words that impute the commission of a criminal offense. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88-89, 672 N.E.2d 1207 (1996).

Plaintiff maintains that the use of the word "kidnapped"

establishes defamation *per se* because kidnapping is a criminal offense in Illinois (720 ILCS 5/10—1 (West 2000)) and it is defined by one dictionary as "unlawful" seizure and detention. See American Heritage Dictionary 700 (2d coll. ed. 1982). However, a statement alleged to be defamatory is not actionable if it is true. *Cianci*, 298 Ill. App. 3d at 424.

### C. Substantial Truth

The first question certified under Rule 308 asks: "whether the statement 'Deirdre Harrison kidnapped Beatrice Tabacchi' is substantially true where Plaintiff Deirdre Harrison was found to have removed her daughter Beatrice Tabacchi from Beatrice's place of habitual residence in violation of the Hague Convention on the Civil Aspects of International Child Abduction." The Sun-Times contends that wrongful removal under federal and international child abduction law is, in essence, the same thing as kidnapping, thus making the statement substantially true and not defamatory as a matter of law.

■ The defendant need demonstrate only the "substantial truth" of the allegedly defamatory material to establish the defense of truth to a defamation action. *Cianci*, 298 Ill. App. 3d at 424; *Lemons v. Chronicle Publishing Co.*, 253 Ill. App. 3d 888, 890, 625 N.E.2d 789 (1993). Such demonstration is made where the defendant shows that the "gist" or "sting" of the allegedly defamatory material is true. *Lemons*, 253 Ill. App. 3d at 890; *American International Hospital v. Chicago Tribune Co.*, 136 Ill. App. 3d 1019, 1022, 483 N.E.2d 965 (1985). Where the plaintiff's own characterization is not substantially different from the allegedly defamatory language, such language may be deemed substantially true. *American International Hospital*, 136 Ill. App. 3d at 1023. Further, allegedly defamatory material is not actionable even where it is not technically accurate in every detail. *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1026, 756 N.E.2d 286 (2001); *Cianci*, 298 Ill. App. 3d at 424.

■ The substantial truth of a statement is normally a jury question, but where no reasonable jury could find that substantial truth had not been established, the question is one of law. *Parker*, 324 Ill. App. 3d at 1026; *Cianci*, 298 Ill. App. 3d at 424.

The district court found Harrison had violated the Hague Convention and the federal implementing act, the International Child Abduction Remedies Act (ICARA) (42 U.S.C. § 11601 *et seq.* (1988)), by wrongfully removing Beatrice from Italy, which was Beatrice's habitual residence and where Tabacchi had custody rights. See Hague Convention, ch. III, art. 12; 42 U.S.C. § 11603 (1988). The Sun-Times argues that using the word "kidnapped" conveyed the gist or sting of the

court's wrongful removal finding. See, *e.g.*, *Lemons*, 253 Ill. App. 3d at 890 (series of newspaper articles containing minor inaccuracies about store employee's arrest and conviction for shoplifting but which "clearly conveyed *** the nature of the events," *i.e.*, the gist or sting, were not defamatory); *Lotrich v. Life Printing & Publishing Co.*, 117 Ill. App. 2d 89, 94-95, 253 N.E.2d 899 (1969) (newspaper article reporting the plaintiff's guilty plea to indecent exposure where the plaintiff actually did not contest criminal charges for disorderly conduct was not defamatory because article was generally accurate and conveyed the gist or sting).

Plaintiff asserts that the use of the word "kidnapped" is defamatory because it denotes conduct punishable under the Illinois criminal statute. See 720 ILCS 5/10—1 (West 2000). It is undisputed that such a criminal offense exists in Illinois. Yet, undermining her own argument, plaintiff also contends that she could not have been convicted of kidnapping under that statute because it does not apply to a parent who kidnaps her own child if the child is under the age of 13. See 720 ILCS 5/10—1(b) (West 2000); *People v. Algarin*, 200 Ill. App. 3d 740, 750, 558 N.E.2d 457 (1990). The question here, however, is not whether plaintiff could have been convicted of a criminal offense in Illinois, but whether "kidnapping" always refers only to this specific offense in our criminal code or whether the word has other connotations as well.

Dictionary definitions of "kidnap" are not based on the violation of any particular statute. Rather, dictionaries employ more generic terms to describe a wrongful act: "to carry (an unwilling person) away by unlawful force or fraud or to seize and detain for the purpose of so carrying away—compare ABDUCTION[;] to seize and carry or take away often wrongly <*kidnapped* the children for the afternoon>" (emphasis in original) (Webster's Third New International Dictionary 1241 (1981)); "[t]o seize and detain unlawfully and usually for ransom" (American Heritage Dictionary 700 (2d coll. ed. 1982)).

Plaintiff relies upon the American Heritage Dictionary's characterization of the conduct as unlawful and asserts that, in common or legal usage, "kidnapping" necessarily entails the seizure of "an unwilling person," the use of force or fraud, and the secret confinement of that person. The Sun-Times maintains that "kidnapping" is now used interchangeably with "abduction," which traditionally was defined specifically as the kidnapping of spouses and children. See 1 Am. Jur. 2d *Abduction & Kidnapping* § 3 (1994) (discussing similarities and distinctions between the two terms, which both refer to "the unlawful taking or detention of one person by another"). See also Black's Law Dictionary 5 (6th ed. 1990) ("abduction" means "[t]o take away surreptitiously by force in kidnapping").

While dictionaries agree on the conduct at issue—the seizing and carrying or taking away, and detaining, of another—their definitions are not dispositive of this question. Rather, definitions of "abduct" refer back to kidnapping: "to carry (a person) off by force: lead (a child) away wrongfully—compare ABDUCTION, KIDNAP" (Webster's Third New International Dictionary 3 (1981)) and "[t]o carry off by force; kidnap" (American Heritage Dictionary 66 (2d coll. ed. 1982)). Furthermore, in the specific area of child custody, kidnapping and abduction are given essentially interchangeable definitions. 1 Am. Jur. 2d *Abduction & Kidnapping* § 34 (1994) ("kidnap" has assumed nonlegal connotation; literature on parental abduction refers to conduct as "kidnapping" or "abduction"). See also 51 C.J.S. *Kidnapping* § 4 (2002) (discusses kidnapping by parents); M. Jasper, Child Custody 85, 89 (1997) (glossary defines abduction as "[t]he criminal or tortious act of taking and carrying away by force" and kidnapping as "[t]he illegal taking of a person against his or her will").

The Sun-Times contends that its usage of "kidnapped" conforms to generally accepted usage in such parental custody context and to usage specifically in the Hague Convention context. Plaintiff maintains, however, that the Hague Convention does not provide a legal framework for a kidnapping determination but instead attempts to eliminate motives for wrongful removals of children.

It is uncontroverted that the Hague Convention does not provide for criminal penalties; indeed, the very title (Convention on the *Civil* Aspects of International Child Abduction) of the convention makes clear that point. The parties do not dispute that the district court's finding of violation did not impose criminal liability on Harrison.

Rather, the stated objectives of the Hague Convention are twofold: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, ch. I, art. 1. The convention provides that decisions made under its authority concerning the return of a child are not determinations of any custody issues. Hague Convention, ch. III, art. 19. The federal implementing act, ICARA, limits determinations in such cases only to rights under the convention rather than the merits of any underlying child custody cases. 42 U.S.C. § 11601(b)(4) (1988).

We must, then, consider whether the wrongful removal of a child under the convention, which provides only civil penalties, is substantially the same thing as kidnapping. To determine whether such wrongful removal, or abduction, is synonymous with kidnapping, we examine the characterization of the conduct the convention sought to deter. From the outset, terminology was at issue.

According to the explanatory report of the convention's official reporter, the general avoidance by the convention of a definition of its terms followed long-established tradition. E. Perez-Vera, Explanatory Report, Hague Conference on Private International Law, 3 Acts and Documents of the Fourteenth Session, par. 53 (1980) (Perez-Vera Report). The report recognized the inconsistencies between terms used in the convention title and the text. Perez-Vera Report, par. 53. Because the scope of the convention was limited and did not include criminal law, the convention attempted to avoid ambiguity and for that reason did use not the term "kidnapping" in the text. Perez-Vera Report, par. 53.

However, rather than avoiding confusion, such usage in the convention reflected and perpetuated ambiguities of terminology then in use in legal literature. See A. Dyer, *To Celebrate a Score of Years!*, 33 N.Y.U. J. Int'l L. & Pol. 1, 5-6 (2000) (article by convention participant who authored preliminary materials relied on in drafting of convention). "Legal kidnapping" was the topic originally proposed for the convention; however, when the convention later acknowledged that term to be an oxymoron, it settled on "international child abduction" instead. 33 N.Y.U. J. Int'l L. & Pol. 1 at 3, 5. Further, the problem addressed by the Hague Convention has been termed "parental kidnapping" and "childnapping" as well as child abduction. A. Passanante, Note, *International Parental Kidnapping: The Call for an Increased Federal Response*, 34 Colum. J. Transnat'l L. 677, 677-78 (1996) (most child kidnappings are perpetrated by family members); see generally R. Campbell, Note, *The Tort of Custodial Interference— Toward a More Complete Remedy to Parental Kidnappings*, U. Ill. L. Rev. 229 (1983).

Prior to the ratification of the convention and the adoption of ICARA, congressional hearings were held on "parental kidnapping." See M. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L. Rev. 593, 602, 606 (2000) (citing subcommittee hearings). In the Letter of Transmittal to the Senate, the President of the United States asserted that the convention "would represent an important addition to the State and Federal laws \*\*\* designed to combat parental kidnapping." 51 Fed. Reg. 10495 (1986). Years after the convention and ICARA became law, the federal government continued applying the term "kidnapping" to the problem addressed by those laws. G. DeHart, Ed., International Child Abductions; A Guide to Applying the Hague Convention, with Forms 154, 163 (2d ed. 1993) (parental abduction and kidnapping used interchangeably in publications of U.S. Department of State and other organizations).

A subsequently enacted federal law, the International Parental Kidnapping Crime Act of 1993 (IPKCA), proscribed the removal from or retention outside the United States of a child with the intent to obstruct the lawful exercise of parental rights. 18 U.S.C. § 1204(a) (1994). Under IPKCA, essentially the same conduct prohibited under the Hague Convention, the removal (or retention) of a child in violation of a parent's custody rights, was deemed "kidnapping" and made a criminal offense. 18 U.S.C. § 1204(a) (1994); see also 28 U.S.C. § 1738A, Congressional Findings & Declaration of Purpose (Supp. 1980) (Parental Kidnapping Prevention Act of 1980) (to deter "abductions and other unilateral removals of children" across state lines).

Similarly, federal courts have used the term "kidnapping" to refer to the abduction or wrongful removal of a child in federal cases involving custody disputes. In a case relied upon by the Sun-Times, a father brought a defamation action against a newspaper that had printed a letter critical of judicial custody proceedings and in which the author asserted that the child's father kidnapped his son. *Anderson v. Cramlet*, 789 F.2d 840 (10th Cir. 1986). The Tenth Circuit found the defamation action was properly dismissed because the use of "kidnapping" was, "in a popular sense," a truthful and accurate description of the father's conduct. *Anderson*, 789 F.2d at 844. In reaching this conclusion, the Tenth Circuit noted that common usage rather than legal research is determinative of the meaning of an allegedly defamatory statement. *Anderson*, 789 F.2d at 844. According to such usage, the plaintiff's taking of his son without the knowledge or consent of the child's mother would be characterized as kidnapping. *Anderson*, 789 F.2d at 844. The court further noted that the word "kidnap" had acquired a "non-legal connotation" in the area of child custody to describe one parent's taking (or concealing) of his child from the other parent. *Anderson*, 789 F.2d at 844. Based upon the "non-technical meaning of the word 'kidnap' [that had been] acquired in the child custody context," the description of the plaintiff's conduct as kidnapping was substantially true as a matter of law. *Anderson*, 789 F.2d at 845.

In Hague Convention cases specifically, courts have described the conduct proscribed by the convention as kidnapping. In a case where a petition was brought for return to Australia of a child allegedly wrongfully retained by one parent in the United States, the Third Circuit characterized the Hague Convention as reflecting universal concern about "the harm done to children by parental kidnapping." *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995); see also *Egervary v. Rooney*, 80 F. Supp. 2d 491, 494 (E.D. Pa. 2000) (citing *Feder* and characterizing the Hague Convention as a "multilateral international treaty on parental kidnaping").

Plaintiff relies solely upon one Hague Convention case, *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859 (N.D. Ill. 2001), for her assertion that the conduct proscribed by the convention is not kidnapping. There, as in the Tabacchi case, the district court found the respondent violated the Hague Convention by wrongfully removing her daughter from Italy and wrongfully retaining her in Chicago. However, the respondent "made no secret of her whereabouts" before departing with her daughter. *Fabri*, 221 F. Supp. 2d at 871. Rather, in contrast to plaintiff's airport postcard, the respondent attempted to contact her estranged husband before leaving and left him a note informing him of her destination and the family medical emergency necessitating the trip. *Fabri*, 221 F. Supp. 2d at 864.

In *Fabri*, the court admitted it "struggled with the question of whether [the respondent's] *removal* of [her daughter] can fairly be characterized as 'wrongful,' " but found "[a]mple evidence supports the conclusion that [her] continued *retention* of [the child] must be characterized as wrongful." (Emphasis added.) *Fabri*, 221 F. Supp. 2d at 871, 872. In language relied upon by plaintiff, the court explained the difficulty in finding the removal wrongful because the respondent's actions were not, "in this court's view, conduct consistent with what we traditionally understand as 'kidnapping.' " *Fabri*, 221 F. Supp. 2d at 871. The removal was wrongful even though the respondent made known her destination, *i.e.*, acted unlike a kidnapper. Contrary to plaintiff's position, the court's distinction in *Fabri* would tend to support the conclusion that wrongful removal may generally be characterized as kidnapping. If that were not the case, there would have been no reason to distinguish the nature of the removal in that particular instance.

Plaintiff further argues that the lack of a specific finding of kidnapping by the district court defeats an assertion that such characterization of the violation was substantially true. However, the court was not required to make such finding to conclude plaintiff violated the Hague Convention. Moreover, it was plaintiff who brought the issue of kidnapping before the court. In her proposed facts, plaintiff stated that Tabacchi accused her of kidnapping and she raised the potential of pending criminal kidnapping charges in her psychological harm defense.

Finally, plaintiff also argues that the court issued the violation order three months before the Sun-Times article was published, thus establishing that the article was not substantially true. She asserts that the leader falsely stated that the court ruled "Monday" (*i.e.*, presumably, Monday, May 22) when the order was actually issued in February. However, the return order was issued by the court three

months after the February violation order (*i.e.*, issued on Thursday, May 11, 2000, docketed on Friday, May 12, 2000) so that Tabacchi could take measures to ensure that plaintiff would not face criminal kidnapping charges in Italy. The May 11 return order indicated "Docketing to mail notices" and that mailing date may explain the reference to a ruling "Monday." Contrary to plaintiff's argument, such statement does not establish in any way the falsity of the article.

■ Although we are aware that the Hague Convention violation reported in the Sun-Times' leader article was one of wrongful removal, we find that the use of the word "kidnapped" in that instance conveyed the gist of such finding. Had the technically precise term of "wrongful removal" been used, it would have been in the context of an international child abduction treaty. Abduction and kidnapping are essentially synonymous in definition and interchangeable in usage in the parental custody area: both words are used for a wrongful taking, or removal. Additionally, despite the correction notice which clarified that there was no specific finding of kidnapping, Hague Convention cases and other federal materials concerning wrongful removal in instances of child abduction apply both terms interchangeably. In this instance, the use of the word "kidnapped" conveys the gist or sting that would be conveyed by the phrase "wrongful removal under federal and international child abduction law." Therefore, we find the statement, "Deirdre Harrison kidnapped Beatrice Tabacchi," to be substantially true and answer the first certified question in the affirmative.

### D. Innocent Construction

The second question certified under Rule 308 asks: "whether the statement 'Deirdre Harrison kidnapped Beatrice Tabacchi' on the front-page [*sic*] of the Chicago Sun-Times newspaper must be read together with the accompanying article on page 16, and if so, whether said statement is then reasonably capable of an innocent construction."

■ Even where a statement falls into one of the recognized *per se* categories, it will not be actionable as defamatory if it is reasonably susceptible of an innocent construction. *Bryson*, 174 Ill. 2d at 90. The innocent construction rule, as first adopted by our supreme court in *John v. Tribune Co.*, 24 Ill. 2d 437 (1962), held that words used in an allegedly defamatory statement must be given their natural and obvious meaning. *John v. Tribune Co.*, 24 Ill. 2d 437, 442, 181 N.E.2d 105 (1962). The rule required that an allegedly defamatory article must be read as a whole and words therein that were "capable of being read innocently must be so read and declared nonactionable as a matter of law." *John*, 24 Ill. 2d at 442.

The innocent construction rule was later modified in recognition that its application led to inconsistencies, inequities, and confusion when courts strained to find "unnatural" but possibly innocent meanings of words. *Chapski v. Copley Press*, 92 Ill. 2d 344, 350-51, 442 N.E.2d 195 (1982). As modified, the rule requires the meaning of the statement to be reasonably viewed; the modified rule still requires that an allegedly defamatory statement be considered in context, with the words and the implications therefrom given their natural and obvious meaning. *Chapski*, 92 Ill. 2d at 351. However, if the complained-of statement so construed may reasonably be innocently interpreted, it cannot be actionable *per se*. *Chapski*, 92 Ill. 2d at 351. See also *Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 262, 581 N.E.2d 275 (1991) (alternative dictionary definitions are not dispositive but provide persuasive authority for reasonable innocent construction of statement construed in context).

■ As a general rule in applying the innocent construction rule, a newspaper headline and the text of the article to which it refers are to be considered as one document and read together as a whole. *American International Hospital*, 136 Ill. App. 3d at 1025. See also *Antonelli v. Field Enterprises, Inc.*, 115 Ill. App. 3d 432, 435, 450 N.E.2d 876 (1983); *Naked City, Inc. v. Chicago Sun-Times*, 77 Ill. App. 3d 188, 190, 395 N.E.2d 1042 (1979). Not only is the headline to be considered with the body of the article as a single entity, but the "import of the entire article" must be considered in reaching a determination of reasonable innocent construction. *Owen v. Carr*, 134 Ill. App. 3d 855, 860, 478 N.E.2d 658 (1985), *aff'd*, 113 Ill. 2d 273, 497 N.E.2d 1145 (1986).

The Sun-Times contends that the statement must be read in context with the referred-to article on page 16, and when read as a whole, the text of the page-16 article negates any possible negative inference from the front-page statement. Plaintiff counters that the Sun-Times offers a strained interpretation of "kidnapping" of the type common before the innocent construction rule was modified, citing the dictionary definition example of "kidnapping the children for the afternoon." However, as discussed earlier, dictionary definitions alone are not dispositive in this instance. Plaintiff has conceded in argument that "kidnapping" is susceptible of multiple definitions. It is the common usage in the custody and Hague Convention contexts, rather, that makes reasonable the construction of kidnapped that does not refer to a violation of a criminal statute and thus is an innocent one.

Plaintiff also argues that an article should not be considered in the context of the headline and the statement here should be considered in isolation because it appeared on the front page of the

newspaper while the article appeared inside. Plaintiff's argument consists primarily of her assertions about the "absolute" nature of the statement. She relies upon a Nevada state case, *Las Vegas Sun, Inc. v. Franklin*, 74 Nev. 282, 329 P.2d 867 (1958), and the Restatement (Second) of Torts but fails to cite any pertinent Illinois case law to support her argument.

 The inside article accurately reports the district court's finding of wrongful removal and the order of return. The subheading above the page-16 article refers to the violation of "an international treaty on abduction" and the article explains that the "issue is whether Harrison had her husband's permission to take their child out of the country." If anything, the article was sympathetic to plaintiff, citing her attorney's explanation that allegations of spousal abuse raised by plaintiff are "largely irrelevant in Hague petition cases" and characterizing Tabacchi's petition as "play[ing] the Hague petition trump card." Plaintiff's virtually unsupported argument has not persuaded us that the front-page statement should be read in isolation. Rather, considering that the statement was contained in a leader article which specifically referred to the inside article, the page-16 article must be considered together with the front-page statement.

Further, even if the front-page leader were not read in context with the inside article, the statement alone may reasonably be innocently construed. See *Owen*, 134 Ill. App. 3d at 861 ("intimidate" reasonably interpreted as conduct other than commission of crime of intimidation); *Garber-Pierre Food Products, Inc. v. Crooks*, 78 Ill. App. 3d 356, 360, 397 N.E.2d 211 (1979) ("blackmail" and "extortion" reasonably capable of innocent construction rather than commission of crime). As stated earlier, the use of the word "kidnapped" does not necessarily denote a criminal offense, but is also used in custody contexts to describe a wrongful taking of a child. See *Anderson*, 789 F.2d at 844-45. In common usage, one parent's taking a child from the custody of the other parent is often referred to as parental kidnapping or abduction. See, *e.g.*, 69 Fordham L. Rev. at 606-07 (discussing press reports of parental kidnapping cases). Moreover, the front-page material focused on Beatrice's return to Italy rather than any potential penalties that would have been imposed if there were a criminal offense. Finally, the print size of the leader was essentially the same as that used in the text of the articles, defeating plaintiff's assertion that the allegedly defamatory statement would be read in passing by numerous people who would not read the inside article. Therefore, we answer the second certified question in the affirmative, finding that the statement must be read together with the article and the statement is reasonably capable of an innocent construction.

## E. Fair Report Privilege

The third question certified under Rule 308 asks: "whether the statement 'Deirdre Harrison kidnapped Beatrice Tabacchi' is a fair report of the district court's holding in *Tabacchi v. Harrison*, 99 C 4130 (N.D. Ill.) under the fair-report privilege."

■ The fair report privilege protects the news media from defamation actions when it reports information obtained from governmental and public proceedings on matters of public interest and provides that such reports are nonactionable as defamation. *Lulay v..Peoria Journal-Star, Inc.*, 34 Ill. 2d 112, 115, 214 N.E.2d 746 (1966); *O'Donnell v. Field Enterprises, Inc.*, 145 Ill. App. 3d 1032, 1035, 491 N.E.2d 1212 (1986). The privilege also applies to news accounts that are not complete reports but fair abridgements of the proceedings. *O'Donnell*, 145 Ill. App. 3d at 1036. Such determination is made by comparing the gist or sting of the alleged defamation in the official report or proceedings with the gist or sting in the news account; if it is the same, then the news item is a fair abridgement of the proceedings and is covered by the reporting privilege. *Dolatowski v. Life Printing & Publishing Co.*, 197 Ill. App. 3d 23, 26-27, 554 N.E.2d 692 (1990); *O'Donnell*, 145 Ill. App. 3d at 1036.

■ The Sun-Times contends it fairly reported the results of the Tabacchi proceedings and therefore the statement was privileged. It argues that the gist or sting of its report was not substantially different from that produced by the proceedings, *i.e.*, that kidnapping was not substantially different from the finding of wrongful removal. Plaintiff argues that the privilege does not apply because no explicit finding of kidnapping was made by the district court.

Again, it is undisputed that the district court found that Beatrice was wrongfully removed from Italy by plaintiff without Tabacchi's knowledge or permission. Furthermore, the summary of the district court's finding in the text of the article is fair and accurate: plaintiff was found in violation of the Hague Convention. The headline had to succinctly convey that there was a finding of wrongful removal of a child under international child abduction law which imposes civil rather than criminal liabilities. Given the complexities of the ruling, the characterization of this violation as kidnapping is, as earlier stated, substantially the same in its gist or sting as wrongful removal under the child abduction law. Considering the space limitations inherent in the front-page headline and leader, it is an accurate abridgement for the Sun-Times to characterize this finding as kidnapping. Accordingly, we answer the third certified question in the affirmative.

Finally, we need not address the Sun-Times' contention that

plaintiff's false light count is derivative of her defamation count as that question is not contained in the certified questions before us.

Certified questions answered; cause remanded.

McNULTY and O'MALLEY, JJ., concur.