2025 IL App (2d) 240354
No. 2-24-0354
Opinion filed April 25, 2025
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| BRYAN YOUNGE, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 23-LA-93 |
| | ) | |
| RYAN BERMAN, | ) | Honorable |
| | ) | Joel D. Berg, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Bryan Younge, appeals the circuit court of McHenry County's order dismissing his second amended complaint alleging that defendant, Ryan Berman, committed defamation *per se* and tortious interference with a prospective economic advantage. On appeal, Younge argues that he properly stated claims for relief relating to each claim. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Younge, a resident of the Village of Lakewood, was appointed to serve as a trustee for the village board for a term spanning from June 2019 to May 2021. In April 2020, Younge reportedly became aware of an incident involving the village's police chief, Todd Richardson, and he sought to investigate the incident "to obtain authority to terminate" Richardson. During this investigation,

Younge purported to have learned of a "toxic work environment" that encompassed the village's administration and was propagated by other trustees; the village's chief administrative officer, Jeannine Smith; as well as the village president, Phil Stephan. According to Younge, as a result of his investigation, several village employees warned him of the potential of retaliation from Smith and Stephan. On May 4, 2020, Younge and Stephan had a heated confrontation at the village's offices. On May 6, 2020, Younge sent an e-mail to several other trustees concerning his investigation and implicating Smith and Stephan in certain misconduct. Following the e-mail's delivery, "communications and events" concerning the village board grew even more contentious.

¶ 4       On July 28, 2020, the village board "authorized" Stephan to send a letter to the McHenry County state's attorney, Patrick Kenneally, requesting an investigation into Younge as a result of the tactics he used in his investigation. In the letter,[1] the board "request[ed] that [Kenneally's] office investigate the harassment by Bryan Younge to determine whether his actions violate any stalking or harassment provisions of the Illinois Criminal Code." The letter offered "a sampling of [Younge's] emails and texts to various Board members," which included:

"1) Implied physical threats, including the following:

a) Doxing of Trustee Ulrich by publishing the location of his residence

b) Threatening Trustee Berman and challenging him to 'take a walk'

2) Continued use of the FOIA process as a political weapon

3) Public declarations that Trustees are 'under investigation'

4) Continued and sustained threats that Trustees will be subjected to lawsuits

5) Harassing text messages sent at all hours of the night

---

[1]The letter, as depicted in the record, is dated July 24, 2020. However, a village board meeting agenda, which is also contained within the record, suggests that the letter was actually sent on July 28, 2020.

6) Withering harassment of the Village's [chief administrative officer (CAO)]

7) Taunting via electronic communication."

According to the letter, the 20 attached examples of Younge's correspondence "demonstrate[ed] the harassment that has been directed towards [Smith], [Stephan], and multiple Trustees."

¶ 5                                                  A. The Packets

¶ 6     On August 5, 2020, Richardson was put on administrative leave, and Younge continued with his investigation, filing a series of Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020)) requests in order to continue his investigation into the village. However, effective October 3, 2020, Younge resigned from his position as trustee. Shortly thereafter, Berman anonymously sent a packet of materials (Packet 1) to Younge's employer, Newmark Knight Frank (Newmark). Packet 1 included a cover letter, which read:

> "You have a problem.
>
> Specifically, a highly compensated employee whose actions in his community have multiple residents and board members fearful for their safety. His actions have, in many instances, occurred during work hours. His actions have, in many instances, carried Newmark's corporate email signature.
>
> I have attached many documents highlighting your employee's actions within his community. Specifically:
>
> 1) Bullying and electronic harassment of local officials, including a 68-year[-]old woman[;]
>
> 2) Threats of investigation and incarceration towards local officials[;]
>
> 3) Fat-shaming of multiple local officials and village residents[;]
>
> 4) Implied physical threats towards local officials[;]

5) Doxing of a local official, including posting images of his home online[;]

6) Copying village employees in on his threats[;]

7) Threatening a village resident with forwarding an email string to his employer[;]

8) Multiple complaints files [*sic*] with the Illinois Attorney General over perceived violations, none of which he has won[; and]

9) Dozens and dozens of FOIA requests filed with the Village in an effort to stop the Village from functioning[.]

Finally, two more items that I have attached:

10) Mr. Younge hatched a plan to overthrow the local government with a plan to make himself Village Manager. He did this over Newmark's signature.

11) Mr. Younge was also referred to the State's Attorney over his continued harassment of local officials.

So, as you can see, you have a problem.

Newmark's fingerprints are all over this. They are on the email where Mr. Younge hatched his plan to overthrow the local government. They are on emails where he bullies an elderly woman. They are in the documents sent to the State's Attorney. And, [G]od forbid, should anything worse than electronic harassment occur, your company's fingerprints will be all over that as well."

Also included in Packet 1 was the July 28, 2020, letter and materials sent to Kenneally; a printout of Younge's corporate biography, which had been sourced from Newmark's website; copies of Younge's correspondence; and a log of FOIA requests that were attributed to Younge. Of note, one of the attached e-mails included a "suggested roadmap" that Younge had compiled on May 6,

2020, detailing how he and others could "tender resignations" to Stephan and Smith before replacing them as village president and CAO, respectively.

¶ 7 A second packet (Packet 2) was also sent to Newmark, which Younge also attributed to Berman. This packet also included a cover letter, which read, in its entirety, "IS THIS HOW YOU WANT YOUR COMPANY REPRESENTED?" Like the previous mailing, Packet 2 included copies of certain of Younge's correspondence with other village personnel, with many of his e-mails including a Newmark signature block. Additionally, like Packet 1, Packet 2 included documents concerning the board's request for Kenneally to investigate Younge and a news article concerning the same.

¶ 8 In April 2021, Younge learned through Newmark that it received the packets. He was notified that, as a result of the packets' contents, he "could no longer be approved" for a pending promotion that he had expected.

¶ 9 B. Procedural History

¶ 10 Younge filed suit against Berman in federal court, alleging first amendment retaliation, due process violations, Title VII violations, and state law claims. *Younge v. Berman*, No. 3:22-cv-50099, 2023 WL 2374781 (N.D. Ill. Mar. 6, 2023). The district court ultimately dismissed Younge's federal claims and declined to exercise supplemental jurisdiction over his state law claims. *Id.* at *6.

¶ 11 On April 4, 2023, Younge filed his complaint against Berman in the circuit court of McHenry County. On March 15, 2024, Younge filed his second amended complaint, arguing tortious interference with a prospective economic advantage (count I); defamation *per se*, resulting from an article that quoted statements allegedly made by Berman (count II); defamation *per se*,

relating to the letter to Kenneally (count III)[2]; and defamation *per se*, as to the packets that were sent to Newmark (count IV). On April 5, 2024, Berman filed his motion to dismiss the second amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2022)), arguing that Younge failed to make any claims for which relief could be granted, because the information provided via the packets was "not false," and that Berman otherwise was entitled to immunity. Berman also argued that some of the publications underlying Younge's claims were privileged and that other claims were untimely. Pertinently, in his response to the motion, Younge withdrew both counts II and III.[3]

¶ 12    On May 17, 2024, the court held a hearing on the motion to dismiss. During the hearing, the court asked Younge whether it was true that the packets that were sent to Newmark "contain[ed] his words." Younge replied, "But, Your Honor, they don't. What they are is words taken out of context." The court asked *how* Younge's words were taken out of context, leading him to respond, "They're not complete emails, Your Honor. There are responses and communications back and forth that are omitted." Berman generally disagreed, arguing that the packets included proper context and that the only information "deleted" from the packets was the names of any recipients engaged in the communications with Younge.

---

[2]In his brief, Younge conflates the counts for his claims concerning the Kenneally letter and the news article.

[3]Both the contents of the Kenneally letter and at least some quoted portions of the article remained subject to review, however, as they were included within the packets that were sent to Newmark under count IV.

¶ 13    Following this brief argument, the court granted the motion to dismiss with prejudice, telling the parties that it "agree[d] with every single point raised by [Berman] on every single count."

¶ 14    Younge timely appeals.

¶ 15                                    II. ANALYSIS

¶ 16    Younge makes two arguments on appeal, contending that the trial court erred in finding that he failed to adequately make claims of (1) tortious interference with a prospective economic advantage and (2) defamation *per se*. We address these contentions in turn.

¶ 17    Illinois is a fact pleading jurisdiction. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). Thus, while a complaint need not include specific evidence buttressing its claims, it must allege sufficient facts to "bring a claim within a legally recognized cause of action." *Ash v. PSP Distribution, LLC*, 2023 IL App (1st) 220151, ¶ 19. To this point, conclusory allegations or conclusions of law are not a proper stand-in for well-pleaded facts. *Id.*

¶ 18    A motion to dismiss under section 2-615 of the Code (735 ILCS 5/2-615 (West 2022)) challenges the legal sufficiency of a complaint as a result of defects apparent on its face, while a motion to dismiss based on section 2-619 of the Code (*id.* § 2-619) admits the legal sufficiency of a complaint, while raising defects, defenses, or other affirmative matters that defeat a claim. *Northwestern Illinois Area Agency on Aging v. Basta*, 2022 IL App (2d) 210234, ¶¶ 31-32. Section 2-619.1 of the Code, on the other hand, "provides that motions with respect to pleadings, pursuant to sections 2-615 and 2-619 of the Code [citation] may be filed together as a single motion." *Id.* ¶ 30. "In considering a combined motion to dismiss pursuant to section 2-619.1, we accept all well-pleaded facts in the complaint as true, drawing all reasonable inferences from these facts in favor of the nonmoving party." *Id.* ¶ 33. Still, "[a] motion to dismiss does not admit conclusions

of law or conclusory factual allegations unsupported by specific facts alleged in the complaint." *Zander v. Carlson*, 2020 IL 125691, ¶ 25. We review *de novo* the trial court's ruling on a motion to dismiss. *Bouton v. Bailie*, 2014 IL App (3d) 130406, ¶ 7.

¶ 19     A. Count I—Intentional Interference with a Prospective Economic Advantage

¶ 20     First, because Younge failed to adequately plead that Berman intended to derail his pending promotion at Newmark, the trial court properly dismissed count I of the second amended complaint.

> " 'To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.' " *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01 (2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996)).

When considering such a claim, "the focus is on the conduct of the party interfering with the expectancy." *Fidelity National Title Insurance Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 219 (2007). It is insufficient for a plaintiff to merely allege that a defendant indeed interfered with a business expectancy; the plaintiff must instead allege that the defendant "acted intentionally with the purpose of injuring the plaintiff's expectancy." *Id.*

¶ 21     Here, because Younge pleaded no facts showing that Berman specifically intended to derail his prospective promotion at Newmark, the trial court properly dismissed Younge's claim of tortious interference with a prospective economic advantage. In the second amended complaint,

Younge made the following allegations as to Berman's supposed knowledge of the hypothetical promotion:

"Upon information and belief, [Berman] knew [Younge] had an expectation of a valid business relationship with Newmark, as [Berman]:

- In [Packet 2], highlighted nearly every mention of [Younge's] signature block containing [Younge's] employment information[;]

- In [Packet 2], chastised [Younge] for using his Newmark email account for Lakewood matters[;]

- Titled, addressed, and mailed the [packets] to [Younge's] superiors in multiple Newmark offices[;]

- Suggested that Newmark was complicit in any of [Younge's] alleged crimes[; and]

- Implied that Newmark should reconsider its employment relationship with [Younge] *** (imprinting as the cover of [Packet 2] in large and all-capitalized font: 'IS THIS HOW YOU WANT YOUR COMPANY REPRESENTED?')"

In his second amended complaint, Younge described the packets and further provided that

"[Berman] intentionally interfered with [Younge's] expectation of a valid business relationship—in the form of [Younge's] acquisition of Newmark's 'Global Practice Leader' leadership position—and prevented it from ripening into a valid business relationship by maliciously and intentionally mailing the [packets], which contained false, fraudulent, and materially altered communications between [Younge] and [Berman] and false and improper allegations of criminal conduct by [Younge], to Newmark."

¶ 22    While Younge *did* plead that Berman "intentionally interfered with [Younge's] expectation of a valid business relationship—in the form of [Younge's] acquisition of Newmark's 'Global Practice Leader' leadership position," this is a conclusory allegation that is unsupported by any allegations in the second amended complaint. Younge never pleads any facts showing, or even suggesting, Berman's knowledge of the pending promotion, much less an intent to thwart it.

¶ 23    Nonetheless, Younge argues that certain of his allegations concerning his employment with Newmark, his e-mail address and signature block, and Berman's knowledge of the same all describe how Berman "acted with purpose and intent to torpedo [Younge's] promotion to Global Practice Leader." We disagree, as these allegations show only that Berman was aware of Younge's employment with Newmark, not his prospective promotion. Otherwise put, there was nothing inherent in Younge's allegations concerning the signature block, e-mail address, or employment in general suggesting knowledge of the promotion. Thus, it simply does not follow from these allegations that Berman could form the requisite intent to specifically frustrate the promotion.

¶ 24    Still, Younge asserts that "[t]here can be no other explanation" for Berman sending the packets to Newmark, other than to thwart his promotion or to have him fired. However, as we have already stated, Illinois is a fact pleading state, and, again, none of Younge's allegations supports an inference that Berman sought to derail the promotion. See *Marshall*, 222 Ill. 2d at 429-30. Further, even if Berman intended to have Younge fired from Newmark, the record shows that he did not succeed, as Younge remained employed after the packets were delivered. Recognizing this juxtaposition, Younge pivots to argue that a form of transferred intent applies:

"*[B]oth* (A) [Younge's] continued employment at Newmark, *and* (B) [Younge's] promised promotion to Global Practice Leader at Newmark, are 'reasonable expectancies' and support a claim for a tortious interference with prospective economic advantage. By

sending the dossiers to Newmark, [Younge's] employer, [Berman] intended to torpedo one or both of these for [Younge]. The fact that [Berman] only succeeded in terms of scuttling the promotion does not somehow absolve him of liability." (Emphases in original.)

Unfortunately, we are unaware of any authority prescribing this novel approach to claims of tortious interference with a prospective economic advantage, and, regardless, Younge does not accompany this theory with any citations of such authority, meaning that the argument is forfeited. See Ill. S. Ct. R. 347(h)(7) (eff. Oct. 1, 2020); *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("Mere contentions, without argument or citation to authority, do not merit consideration on appeal."). Forfeiture aside, it is clear from Illinois case law that, in order to state a viable claim of tortious interference with a prospective economic advantage, a defendant must specifically intend to interfere with the same expectancy that is thwarted by their conduct. See *J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.*, 213 Ill. App. 3d 510, 515 (1991) ("The requisite intent for the tort of intentional interference with a prospective business advantage is defendant's knowledge of a reasonable business expectancy and defendant's subsequent intentional interference which prevents the expectancy from ripening into a valid business relationship."). For all of these reasons, the trial court did not err in dismissing count I of the second amended complaint.

¶ 25                               B. Count IV—Defamation *Per Se*

¶ 26     Next, because Younge failed to allege that Berman made any actionable, false statements that were published in the Newmark packets, the trial court properly dismissed count IV of the second amended complaint. To properly make a claim of defamation, a plaintiff must "allege sufficient facts showing that (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the

publication caused damages." *Project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 20. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id. Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). "A statement is defamatory *per se* if its harm is obvious and apparent on its face." *Id.*

¶ 27 Illinois courts recognize five categories of statements that can be characterized as defamation *per se*:

> "(1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Id.* at 491-92.

In order to successfully make a claim of defamation *per se*, "the substance of the statement[s] at issue must be pled with sufficient precision and particularity so as to permit initial judicial review of its defamatory content." *Id.* at 492. "Precision and particularity are also necessary so that the defendant may properly formulate an answer and identify any potential affirmative defenses." *Id.* Our supreme court has thus reasoned that defamation *per se* claims require a "heightened pleading standard," in that they require a "heightened level of precision and particularity." *Id.* at 495. In order to satisfy this heightened burden, allegations may not be supported only by "information and belief," but instead, facts must be shown on which the belief is founded. *Id.*

¶ 28 Here, in arguing that he made a proper claim of defamation *per se* in count IV of the second amended complaint, Younge heavily focuses on Berman's perceived motive in sending the packets, which, according to Younge, were designed to impute that he lacked ability in his

profession and that he had committed certain crimes. However, Younge gets ahead of himself, as his arguments largely overlook the first element of a claim of defamation *per se*: the existence of a false statement. See *id.* at 491. Because Younge has failed to address this elephant in the room by properly pleading any actionable, false statements that Berman made in either of the packets, the trial court did not err in dismissing count IV of the second amended complaint.

¶ 29                                                    1. Packet 1

¶ 30    According to Younge, Packet 1 "is an 83-page package with a cover letter dated March 21, 2021 [citation omitted] addressed to Mr. Peter Helland, a Senior Vice President in Newmark's Chicago office." Aside from the cover letter, the packet includes "82 pages of emails, text message screenshots, letters, and other documents." Contained within these ancillary documents is the July 28, 2020, letter to Kenneally, which itself included several exhibits containing more of Younge's communications.

¶ 31    Younge repeatedly describes certain "false and defamatory statements" contained within Packet 1, but he does not specifically identify—either in his briefs or, more importantly, in the second amended complaint—any made by Berman. Moreover, Younge failed to plead with any precision or particularity anything of the substance of the defamatory statements that would satisfy the heightened pleading standard for a defamation *per se* claim. For this reason, any allegations in Younge's second amended complaint of false and defamatory statements in in Packet 1 cannot be said to comply with the heightened pleading standards prescribed by *Green*. See *id.* at 495.

¶ 32    In either event, our review of Packet 1 does not reveal any actionable material therein. In determining whether Packet 1 contained any false statements that can be attributed to Berman, it first becomes necessary to ascertain what documents in the packet, if any, included actionable statements. After all, a claim of defamation *per se* is centered around a *defendant's* false

statements. See *id.* Thus, it is axiomatic that Younge's own communications, which make up the vast majority of the packet, cannot support a claim of defamation *per se*.[4] Younge's briefs suggest only three possible documents in Packet 1 that may be attributed to Berman: (1) the adjoining cover letter; (2) the July 28, 2020, letter to Kenneally; and (3) any responses to Younge in the attached communications.

¶ 33    We have reviewed these sources—which, as stated above, include the panoply of possible defamatory statements in Packet 1—and find no actionable statements therein. Truth is an absolute defense to a defamation action. *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 16. Under this reasoning, a statement is not actionable if it is substantially true, meaning the "gist" or "sting" of the statement at issue is true. *Id.* (citing *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003)).

¶ 34    Here, with one exception, the information contained in the aforementioned cover letter is substantially true, as shown by the relevant attachments adjoining the letter. For instance, the letter describes how Younge, a highly compensated employee of Newmark, had acted in a way that left multiple parties "fearful for their safety." Indeed, the communications attached depict Younge, who does not dispute that he is a highly compensated employee of Newmark, using aggressive

----

[4]In the second amended complaint, Younge does allege that certain of his communications were altered via "eliminating email senders and recipients, highlights, redactions, and statements made out-of-context," rendering them false. This allegation does not satisfy the heightened pleading standard for a claim of defamation *per se*, as Younge does not describe what facts lead him to this conclusion. See *Green*, 234 Ill. 2d at 495. Even more, the substance of the communications, as depicted in the record, does not appear to have been altered, and even if certain recipients' names were missing from some of the communications, the messages' substance nonetheless appears intact.

language and threats towards several parties, leaving at least one recipient to "file a police report[ ] and contact a lawyer."[5] A screenshot includes Younge threatening Berman after a contentious exchange, telling him, "Maybe you and I should take a walk sometime in the next couple of weeks." Tellingly, other communications in the packet include a trustee's statement that Younge's actions and words "frighten[ed] [him] greatly." Thus, the record shows that Berman's relevant statements from the cover letter were truthful. The letter also states that many of Younge's harmful actions have "occurred during work hours," often accompanied by "Newmark's corporate email signature." Indeed, multiple of the e-mails contained within the packet were sent by Younge during regular work hours, and many used his Newmark e-mail address and signature. The letter further described Younge's bullying of local officials, including Smith. Undeniably, the communications include many instances of Younge antagonizing other village trustees with aggressive language, including Smith. While this is just a demonstrative example of the truth underlying many of the cover letter's claims, our review of the record shows that *all* the remaining statements in the cover letter concerning Younge's bullying, fat-shaming, and physical threats are all substantially demonstrated by the attached communications.

¶ 35    We do note that one claim made in the cover letter does not seem to be substantially true. Specifically, in the letter, Berman indicates that at least one of the included communications shows Younge "[d]oxing a local official," in that he "post[ed] images of his home online." "An individual engages in the act of doxing when that individual intentionally publishes another person's personally identifiable information without the consent of the person whose information is

---

[5]Ironically, in this interaction, Younge had threatened to inform a village resident's employer that the resident was "using company resources to stalk, harass, and threaten people."

published," leading to damages. 740 ILCS 195/10(a) (West Supp. 2023). The corresponding e-mail from Younge depicts a house, with the message, "This one is better though." The message was sent to the trustees, Smith, and Stephan. While the cover letter characterizes the communication as "doxing" trustee Doug Ulrich, nothing in the photograph suggests that Ulrich—or anyone for that matter—owns the home. Because there is nothing in the photo personally identifying Ulrich, its publication cannot be seen as a form of doxing. *Id.* Regardless, as this action is for defamation *per se* and not *per quod*, it is not enough to publish a false statement about a plaintiff; the statement must fall into one of the aforementioned categories of statements. Younge does not allege that doxing is a crime in Illinois, and our research shows that, in Illinois, the tort carries only certain civil penalties. See *id.* § 15. Additionally, Berman's statement concerning the alleged doxing in no way imputes Younge's inability or a lack of integrity in performing his job. Younge offers no other argument as to how the statement would qualify as defamation *per se*. Accordingly, the record establishes that no statements in the cover letter are actionable as defamation *per se*.

¶ 36    The letter to Kenneally also does not support a claim of defamation *per se*, as its contents are capable of an innocent construction. "[E]ven if a statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent construction." *Tuite v. Corbitt*, 224 Ill. 2d 490, 502 (2006). The question of whether a statement is susceptible to an innocent construction is "a question of law to be resolved by the court; whether the statement was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury if the initial determination is resolved in the plaintiff's favor." *Id.* at 503. "Only *reasonable* innocent constructions will remove an allegedly defamatory statement from the *per se* category." (Emphasis in original.) *Bryson v. News America Publications, Inc.*, 174 Ill. 2d

77, 90 (1996). "Courts must therefore interpret the allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Id.* at 93.

¶ 37    Once more, the letter to Kenneally reads:

"Dear Mr. Kenneally:

The Village of Lakewood Board of Trustees is requesting that your office investigate the harassment by Bryan Younge to determine whether his actions violate any stalking or harassment provisions of the Illinois Criminal Code. A sampling of his emails and texts to various Board members is attached—which is simply the tip of the iceberg. If your office would like to set up a meeting with any of us for an interview or for other information, we would be glad to do so."

The letter also contained the following descriptions of the attached communications:

"Attached, please find exhibits demonstrating the harassment that has been directed towards the Chief Administrative Officer (CAO), the Village President, and multiple Trustees by Trustee Bryan Younge.

The Campaign of harassment has been non-stop and included the following:

1) Implied physical threats, including the following:

a) Doxing of Trustee Ulrich by publishing the location of his residence

b) Threatening Trustee Berman and challenging him to "take a walk"

2) Continued use of the FOIA process as a political weapon

3) Public declarations that Trustees are "under investigation"

4) Continued and sustained threats that Trustees will be subjected to lawsuits

5) Harassing text messages sent at all hours of the night

6) Withering harassment of the Village's CAO

7) Taunting via electronic communication."

The letter to Kenneally included an exhibit list, detailing various communications between Younge and others, in which Younge was characterized as "publicizing [a trustee's] place of residence," "threatening violence," "threatening to weaponize the FOIA process," "threatening investigation," "threatening lawsuits," and "harassing CAO Smith" and other village personnel.

¶ 38    Younge argues that the statements contained within the Kenneally letter constitute defamation *per se*, as they falsely impute that he had committed a crime of moral turpitude punishable by imprisonment and because they were intended to prejudice Younge in his profession. Essentially, Younge reads the Kenneally letter and attached exhibit list as accusing him of specific crimes. Further, because Kenneally declined to investigate Younge, Younge reasons that the statements included in the letter accusing him of certain crimes must have been false.

¶ 39    We disagree. Looking at the Kenneally letter in its entirety, it is clear to us that the authoring trustees never outright accused Younge of any specific crimes. Instead, the letter repeatedly and unequivocally requested Kenneally to investigate "Younge to determine whether his actions violate any stalking or harassment provisions of the Illinois Criminal Code." Thus, Younge's argument necessarily fails. Additionally, the attached exhibit list's descriptions of Younge's communications, as evidenced by the communications themselves, are substantially true, with the exception of the aforementioned doxing claim, which, once more, is not actionable as defamation *per se*.

¶ 40    Nonetheless, Younge argues that, by characterizing his communications as "bullying, threats, intimidation and harassment," Berman sought to use Packet 1 to accuse Younge of several specific crimes, such as: (1) harassment through electronic communications (720 ILCS 5/26.5-4

(West 2020)); (2) stalking (*id.* § 12-7.3(a)); and (3) intimidation (*id.* § 12-6(a)). Again, we disagree. Younge's argument focuses on certain words from the packet's two letters, while ignoring the substance of the Kenneally letter, which, again, repeatedly and unequivocally requests the state's attorney to investigate *whether* any crimes were committed. Further, while the packet does include the words "stalk" and "harass" at times when describing Younge's actions, it is clear from the context of the packet that the terms are used in their general, everyday sense to accurately describe Younge's actions, not to specifically identify certain criminal offenses that Younge had committed.

¶ 41    Lastly, Younge argues that, by including in the attached communications others' unfounded allegations of Younge's wrongdoing, Berman also made false statements accusing Younge of certain crimes. Specifically, Younge cites one of the packet's included communications, in which another trustee, Brian Augustine, said the following: "More threats from Younge. Threats, texts, intimidation attempts, threatening calls, threatening lawsuits, threatening change your vote or else, threats in public chats, threats in social media, threats threats threats." According to Younge, "if true," this communication "would constitute the crime of Intimidation." We disagree. As a start, nothing inherent in this communication is false. As we have stated before, any mention of Younge's threats was substantially true, as evidenced by Younge's own communications. Also, the words "threats" and "intimidation," as used by Augustine, are clearly used here in their colloquial sense, not as any type of legal terms describing any type of criminal offense. Accordingly, the message cannot be categorized as defamation *per se.* For all of these reasons, the record establishes that the contents of Packet 1 do not include any statements that are defamatory *per se.*

¶ 42                                          2. Packet 2

¶ 43     We next turn to the contents of Packet 2. Per Younge, Packet 2 includes a brief cover letter, simply asking its reader, "IS THIS HOW YOU WANT YOUR COMPANY REPRESENTED?" along with "emails, text message screenshots, a Lakewood Board Meeting Agenda, and an [article] published in the Northwest Herald on August 20, 2020, titled: 'Lakewood Village Board Asks for Criminal Investigation into Trustee for Harassment.' " In the second amended complaint, Younge alleges that Berman "published false and defamatory statements about [Younge] in mailing the anonymous [Packet 2] to Newmark's Chicago office, as [Younge's] supervisor orally informed [Younge] that Peter Helland, the Senior Vice President of Valuation at Newmark, received [Packet 2]." In his opening brief, Younge identifies three portions of Packet 2 that allegedly include defamatory material: (1) the cover letter, which "suggest[ed] that [Younge] poorly represents Newmark"; (2) the aforementioned news article; and (3) a village board meeting agenda.

¶ 44     We disagree that any of Berman's communications in any of these sources present any material constituting defamation *per se*, as pleaded in the second amended complaint. First, the cover letter to Packet 2, which simply reads, "IS THIS HOW YOU WANT YOUR COMPANY REPRESENTED?" is not actionable as defamation *per se*. "Language to be considered defamatory *per se* must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary." *Owen v. Carr*, 113 Ill. 2d 273, 277 (1986). Thus, a plaintiff arguing that a defendant made a statement prejudicing him or her in their profession must show that the statement at issue "obviously impute[d] a want of integrity in the performance of [the] plaintiff's employment duties." *Vicars-Duncan v. Tactikos*, 2014 IL App (4th) 131064, ¶ 33. While Younge argues that this phrase implies that he lacks ability in his profession, nothing obvious from the quoted statement ever calls into question his ability to carry out his vocation. Instead, when taken with the attached communications, it is clear that the rhetorical question was meant to draw

attention to Younge's perceived bullying. However, suggesting that someone is a bully is not actionable as defamation *per se*, as such a statement "expresses nonactionable opinion." *Id.*

¶ 45    Next, none of Berman's statements appearing within the news article are actionable as defamation *per se*. In his brief, Younge argues that, by referencing the Kenneally letter within the news article, which Berman then included in Packet 2 and sent to Newmark, Berman defamed him:

> "By including a publication of the [article] in which Casey Buchannon quoted parts of the [Kenneally letter] to 'investigate harassment by [Younge] to determine whether his actions violate any stalking or harassment provisions of the Illinois Criminal Code,' and wherein [Younge] allegedly engaged in a campaign of harassment, sent harassing text messages all hours of the night, conducted ' "withering" harassment of [Smith],' and engaged in 'taunting via electronic communication,' [Berman] repeatedly accused [Younge] of harassment."

Younge argues that

> "the [quoted] statements contained in the [article]—that [Younge] committed crimes of harassment, electronic harassment, threats, implied physical threats, and stalking—are false, because merely two weeks after sending the [Kenneally letter], which is referenced in both [packets], the Lakewood Board received a letter from the State's Attorney's Office, declining to investigate any alleged 'harassing' or 'stalking' by [Younge.]"

¶ 46    We disagree. In a nutshell, Younge argues that, because the Kenneally letter contained Berman's defamatory statements against Younge, which were included within the article, Berman published those false statements by sending a copy of the article to Newmark. However, as we have already explained, nothing in the letter to Kenneally, as well as in the adjoining exhibit list,

could be construed as defamation *per se*, as the materials do not include any accusations that Younge committed any crimes. Thus, Younge's argument necessarily fails.

¶ 47    Younge also argues that the article included defamatory material in that it quoted portions of a published editorial written by Berman that were, in and of themselves, defamatory. Tellingly, Younge does not identify any quotations within the short article to support his claim. Nonetheless, we have reviewed the article and see no quotes from Berman that can remotely be categorized as defamatory. In the one quote from Berman that appears within the article, Berman reads a derisive e-mail from Younge before commenting, "That's a toxic workplace, Bryan." However, as stated above, Younge's own communications cannot support a claim of defamation *per se*, as the first element of a defamation claim requires the defendant, not the plaintiff, to make a false statement. Furthermore, Berman's mention of the toxic workplace is clearly an opinion, which is not actionable.

¶ 48    Finally, Berman's inclusion of the meeting agenda within Packet 2 did not constitute defamation *per se*. In his brief, Younge argues that,

> "[b]y including the Village Board Agenda for the Village Board meeting dated July 28, 2020, in which the Village Board moved to authorize an investigation into Bryan Younge for harassment in [Packet 2], [Berman] accused [Younge] of harassment. [Citation.] This is an accusation that, if true, would constitute the crime of Harassment Through Electronic Communications under [ section 26.5-3(a) of the Criminal Code of 2012 (720 ILCS 5/26.5-3(a) (West 2022))]."

Once more, we disagree. Although Younge once again fails to support his argument by citing any defamatory statements within the three-page agenda, we have examined it and find no defamatory content therein. The portion of the agenda that Younge seemingly takes issue with is one reference

to a "Motion to Authorize Investigation of Bryan Younge for Harassment." Nothing in this isolated statement provides that Younge committed any type of crime involving harassment. Instead, as is the case with the Kenneally letter, the agenda shows only that the board sought an investigation to determine whether any criminal offenses occurred. Because it is not defamation to inquire whether one has broken the law, Younge's claim fails. For all of these reasons, Packet 2 did not include any defamatory materials, and the trial court did not err in dismissing his second amended complaint.

¶ 49                                    III. CONCLUSION

¶ 50     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 51     Affirmed.

---

***Younge v. Berman*, 2025 IL App (2d) 240354**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 23-LA-93; the Hon. Joel D. Berg, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Adam L. Gill, of Fox Swibel Levin & Carroll LLP, of Chicago, and Kevin F. Berry (*pro hac vice*), of Royer Cooper Cohen Braunfeld, of Philadelphia, Pennsylvania, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Joseph W. Smith, of Clark Johnson & Knight, Ltd., of Merrillville, Indiana, and Matthew S. Clark, of Clark Johnson & Knight, Ltd., of Rosemont, for appellee. |

---